## TAYLOR *v.* THE STATE.

1. The rule of law in force in this State which relieves one from criminal responsibility for the commission of an unlawful act on account of mental disease is: If a man has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible. An exception to this rule is, where a man has reason sufficient to distinguish between right and wrong as to a particular act about to be committed, yet, in consequence of some delusion, his will is overmastered, and there is no criminal intent: provided, that the act itself is connected with the peculiar delusion under which the prisoner is laboring. Tested by this rule of the law, the evidence in the case fully supported the conviction for murder.

2. A charge in the following language: "The popular idea of malice in its sense of revenge, hatred, ill will, has nothing to do with the subject [legal malice]; it is an intent to kill a human being in a case when the law would neither justify nor in any degree excuse that intention, if a killing should take place as intended," states a correct principle of law, and it was not error for the presiding judge to give it in this case.

3, 4. There is no error in the charge of the court complained of, nor in the failure to specifically charge the jury in relation to the probative value of the evidence which showed or tended to show insanity

in the family of the accused. While such specific charge would have been proper, it was not demanded by the evidence in this case, certainly not without a written request so to charge.

Argued November 9,—Decided November 18, 1898.

Indictment for murder. Before Judge Felton. Bibb superior court. April term, 1898.

*George S. Jones, C. H. Hall Jr.* and *Dupont Guerry,* for plaintiff in error.

*J. M. Terrell, attorney-general, Robert Hodges, solicitor-general,* and *Roland Ellis,* contra.

LITTLE, J. Abner L. Taylor was brought to trial in the superior court of Bibb county under an indictment charging him with murder. The specific charge in the bill of indictment was that on the 10th day of July, in Bibb county, he feloniously and maliciously killed Minnie L. Taylor by cutting her with a knife. On arraignment the defendant pleaded not guilty. The jury returned a verdict finding the defendant guilty, and sentence in accordance with the verdict was imposed. The defendant filed a motion for a new trial, on several grounds, which will hereafter be considered. The motion to set aside the verdict and grant a new trial was refused, and to the order of the court overruling and refusing the new trial the defendant excepted. The evidence adduced at the trial, as it appears in the record, is voluminous. The material portions of it, are as follows:

*For the State,* C. H. Logue testified: Minnie L. Taylor was my daughter. The accused, Abner Taylor, was married to her March 18, 1897. They had one child, born March, 1898. I was present when my daughter was injured by the defendant. It occurred at my house, in Bibb county, 9 or 10 o'clock in the morning. Two weeks prior to that date my daughter was at the house of Mrs. Taylor, mother of the accused. Eli Taylor, brother of the accused, started home with her, and she came by my house to see her sister, who was sick. We had my daughter's baby at my house at the time. When my daughter came to my house she agreed to stay a day or two, and I told Eli I would carry her home. The child was at my house because my daughter could not nurse it. We kept it there to raise it on the

bottle, as they had no milch cow.   On the day my daughter was injured Eli came there after her to go home.   She did not wish to go.   Eli then left the house and went down the road.   About 25 or 30 minutes after Eli left, the accused came alone.   A few minutes afterwards I again saw Eli.   My attention was first attracted to the accused, whom I saw walking quite fast.   I was sitting on the porch and my daughter was back in the house.   When the accused was about 30 steps from the gate he asked me where Minnie (my daughter) was.   I told him she was in the house. He asked me to tell her to come out there, he wanted to talk to her.   I called to her and she refused to go.   The accused then came to the gate, called to her and told her to come out there. She asked him what he wanted.   He replied that he wanted to talk to her a few minutes.   I then spoke, and said, "If you want to talk, and will talk right and reasonable, come in, and have a chair."   He came on in, and I handed him a chair, which he did not notice, but walked in the door and asked his wife why she didn't come home.   She replied, "Why didn't you come after me?"   He then said, "Ain't you going back?" and she said, "No, I'm not."   He then pulled out a pistol and fired at her and missed her.   I was standing 4 or 5 steps distant, and picked up a piece of ax-handle which was lying there, and struck at his hand, but missed him.   He then fired, and shot me in the head.   He broke and ran through the house and I pursued him. As he jumped out of the door I threw the ax-handle at him and struck him on the back.   I then started to get something else with which to protect myself, and he turned and shot me in the side.   I then walked back and fainted.   In a minute or two I came to my senses, and he was chasing her around through the house, stabbing her with a knife; she was holloing.   He inflicted eight wounds,—six in the back and two in the breast.   It looked like these wounds were made with a knife, dirk or something of that sort; I didn't see it.   This happened on Sunday morning.   My daughter died Monday evening at 4 o'clock. Frank Jones was there when Taylor came up; also my wife and daughter; also my mother and Eli.   I did not see Eli do anything.   I saw Ab running after his wife, and Eli around after him.   My daughter would have been 22 years old in November

next.   I never heard the accused make any threats about his wife.   My gate was 12 or 15 feet from the house.   The accused first asked me where was Minnie; he told me to tell her to come out there, he wanted to see her.   She refused to go.   When she refused to go, she said she was not going; he called again and told her himself, and she said she was not coming.   When he walked to the door and asked my daughter why she didn't come home when he sent for her, she said, " Because I didn't intend to. You wouldn't come, and you have not treated me right, and I am not going unless you do."   And he says, " You are not going ?"   She says, "No, I am not."   He drew his pistol and shot her.   After he shot me he ran through the house to the back door, and was going into the back yard.   No one was out there. At that time my daughter was in the back room.   He was not going in that direction.   He went out because I was after him with a stick.   As he jumped out, I threw the stick and hit him. He turned and shot me in the thigh.   He then came back in the house after my daughter.   I fainted away for a minute or two. When I came to, he was running around the house and through the house and in the room.   She was screaming.   I did not hear him say a word.   I saw him make a motion once or twice.   I. did not see the knife.   She offered no resistance.   Eli was running right behind Ab, and got within 5 or 6 feet from him.   He was following Ab, and Ab was following my daughter.   My daughter had been at home a right smart during her sickness. When she was first taken sick she staid at home a month.   She relapsed and staid there nearly a month.   She would go home and stay a week or two weeks, and she would come to my house and stay a week or two.   She visited me like other daughters that are married do their parents, occasionally, only as I would go or send after her in case of sickness.   I had to go and bring her back and forth a time or two, and bring her to town to the doctor.   I don't know whether Ab refused or not.   Last fall they were living in my house, and their things were there, and he and she staid at his brother-in-law's.   I and my wife went to see them.   I went to the field where he was stacking fodder. When I came back she was ready to go home.   Both got in the wagon and we started off.   We got a hundred or two hundred

yards. He came down the road and cursed, and said that if she didn't come back somebody would die. I did not know that I was carrying my daughter off without his consent. I was not present when he objected; my wife was there. I don't know whether she was present when he objected or not. I don't know whether he objected or consented. My wife and I were not keeping Mrs. Taylor away from Ab. We were doing everything we could to help them along, and help her in her sickness. She had been feebly nearly all the year since she was confined, and some time before. We did all we could to help her, and tried to build her up. It is not a fact that I was trying to keep her away from him, intending that she should not go back and live with him. He made some complaint about her going away. I could hear of it, about her going. The baby was at my house, and staid there from the time it was a month old. It was five or six miles from my house to where he lived. When Ab came to my house the day of the occurrence, he did not have his pistol or weapon in his hand; I never saw it. There were no indications of anger, only the threats he made beforehand, that made her afraid to go to him. He looked like he was angry and mad. He was looking that way at the time of the saying and before anything was done. When I first saw him approaching the gate he made the impression at that time on my mind that he was angry. He looked pale; looked like he was mad. He looked paler than usual. He looked pale enough for me to notice it at a distance. He was tolerably pale. I could tell he did not look natural. I had seen him that way before. I have seen him mad before, but not altogether as mad as he was then. I did not notice anything else peculiar about him. Ab and I were not at outs. We were on good terms. I was with him if he was not with me. He had never shown any animosity at all to me before, only at times last fall; but outside of that everything was always pleasant between him and me, so far as I know. He never made any complaint to me, or I to him. It was always pleasant between us, except that at one time we had a few words; it didn't amount to anything. The next time we met it was all right. That was the time I let his wife go back to him.

Miss Gussie Logue testified: Mrs. Taylor was my sister. I

was present the time she was cut by her husband. When Mr. Taylor came to the house I was in bed. I had been sick about five weeks. When he came my sister was in the back room, and he called her. The first thing I heard, he came to the gate and called her. He told father to tell her to come out here. She said she was not going to do it, for him to come in there. He came in and said there was not but one thing he wanted to know, and that was, was she going home with him; and she told him no, she was not; that he treated her so mean she could not live with him, and she was not going; and he pulled out a pistol and shot at her, but father hit at him and missed him and he shot father. At the time he shot at my sister I was standing in the floor. Father ran through the house, out of the back door, and threw the ax-handle at him. He turned and shot father through the thigh, and he taken out after my sister and run her through the house and commenced cutting her. I saw them when they were going around the house. He was stabbing her every time he got close enough to her. He had a knife. They went out of the back door the first time, and run around the left side of the house, and kept running around the house until he got through cutting her. He left her in the yard. They run through the house one time. My sister was in the back yard when he stopped cutting her. He then went and got in the wagon and went off. His brother took him off. They went off in the wagon. His brother did not take hold of him but begged him off. My sister went in the house and sat on the bed until some one came and put her to bed. She was bleeding from the wounds when she came in. She died Monday evening. Taylor did not say anything as to why he was running after my sister. My sister begged him to quit and let her alone, and he would not do it. My grandmother was in the house. My sister had been at home about two weeks. She had gone to his mother's on a visit, and came by our house to see us. When she got there I had been so sick she would not go home and stay. She decided to stay a week or two. Papa told her to stay. I was there when Eli came for her. She didn't go with him. Ab appeared about five or ten minutes after Eli went off. I have heard Ab Taylor say many times (he was always quarreling

about her going to see her people), he said that was all she cared about, was her people, and all she studied about. He made some threats. He told her he was going to move her clean off where she could not see her people, and she told him if he did she would quit him, and he said if she did he would kill her. That was about a month before he did kill her. I was at his house when he told her so. My sister was cut eight times. After my father struck at Ab and missed him he ran out the back door. My sister went in the side door. He then turned and shot my father, and my father fell and fainted; then Ab came through the house, and says, "Where is Minnie?" I says, "I don't know." About that time Minnie run through the house and run out of the back door. She had gone in the little room. She went out the front door and got in the rear, and he found her out. She didn't have any weapon, did not threaten him, didn't insult him. When I first saw him I noticed he looked black in the face when he came in; he was so mad. I had never seen him look that way before. I had seen him mad before, but not as mad as he was that time. He seemed to be furious, and his face looked black. I did not notice any other peculiarity about his face. When he came in he had nothing in his hand. The cutting killed my sister. She died from the wounds.

*For the defense,* Mrs. Martha Taylor testified: I am the mother of the accused; am a widow. I think my son is about 27 years old. My son was strange from his cradle up. All of his life he has had strange ways. I call them crazy ways. I don't know what they were; anything. He would run around the house and through the house, and I after him. He would look wild and strange and frightened. He would run in and around the house, and I would try and catch him, and he would look wild and frightened. If I got close he would look at me and stop and hollo and scream. On those occasions there had not been anything the matter. I had not done anything to him or threatened him. Maybe he would be at work, not noticing anything. When he was running around he would look back like he was looking at something, or laughing part of the time. Looked like he was nearly frightened to death. If he was afflicted any way when he was a child I don't know anything

about it, only when he was a little baby he had spasms like most·
little babies do; he had them until he was about two years old.
I have not seen him running around and screaming lately, but
he had this running around and screaming all the time he was in
my presence at times.    He was a schoolboy eight or nine years·
old when he did that way,—running around and screaming.    I
remember when he was married.    I have not seen a great deal
of him since.    During the time since he was married when I
would see him he did not talk much.    I would ask him why he
didn't talk, and he would say, "Oh, mama, I am living in tor-
ment; I am in so much trouble."    The trouble was not with
his wife particularly, but with his people,—her people, her
mother and father, her mother especially.    He was complain-
ing that they would not let her stay home; if they did not have
her on the road, they wanted her at their house, and she was
never there at home; and he didn't want her to work; he
wanted her for company.    Whenever he would talk to me in
these latter days he would talk about nothing, only wild, ram-
bling talk about his troubles.    I staid at his house one week
since he was married.    His wife was sick at that time.  · He was
as good and kind as he could be, although sick himself, but he
never was too sick to go and wait on his wife.    I have seen him
sit behind her for hours.    I wanted to relieve him; he would
say, "No, go away."    Her mother was there most of the time.
An old colored woman did the work.    His wife wanted him to
wait on her; if he was not present, any one would do, but if he
was, it didn't matter how poor and sick he was, he must come in
preference to any one else.    I told her several times he was sick
and lying down; "let me do it;" and she says, "No, no, I want
him to do it."    She said he could do it better than any one else,
and could rest her better if he sat behind her.    If the house was
crowded he would lie down by the door; and if he could get a
chance to lie down and rest he would lie down by the side of her.
I have known him to lie down at her feet when there was but
little room.    He put himself to trouble to get little things that
she wanted, and when they were not at the station he went to
other places and got them.    He ate but little during that time.
Whenever he heard Minnie's voice he went to her; he didn't

48

need any one to call him. He was as kind as any one could be to a little baby, when I was there. He was anxious about her. He would sit there and cry night and day, and he frequently brought cool water a quarter of a mile from the spring, although there was a good well there. When they were first married they staid at my house. They got along as loving as they could be, and were very affectionate. I never heard of their quarreling, nor an unkind word passing between them. My oldest child was named Charles. He is dead now. He died crazy, and had fits sometimes. He was eight years old before he walked. He was four years old before he could sit up; he was six years old before he had any teeth; he was seven years old before he ever took anything in his hand. He had fits and spasms, and when he was not at that he was crazy. When he was crazy he would tear up anything, break dishes, beat the back of his hand. He died crazy. I don't remember when he had his last fits before he died, but he was crazy, and he would sort o' get over that a little, and directly he would have a fit. After he got rid of it he told me, "Mama, don't grieve after me, I am going home to Jesus." He told me that about sundown, and at seven o'clock, I think, he died. He never did an hour or a half-hour's work in his life. He did not know how to work. I knew William Taylor very well. He was Ab's first cousin. He was in the asylum; never got grown before he was sent to the asylum. Charlie was eighteen years old when he died; was never at himself enough to go without an attendant. When I would go after water or anything of that kind, Charlie would have to hold to my apron or dress, and I have toted many a pail with him holding to my dress. I couldn't leave him and go after the water. I don't know about Abner liking his wife going to her father's so much. He had a heap to do without her company, and he hated to do without it. He hated to have her gone so much. He begged her to stay at home with him. She was gone the most of her time, and he tried to get her to stay home and to come back. I don't know that he was vexed at her staying away. He was near troubled to death; that is what he was grieving about, because he was staying at home and attending to his farm and cooking for himself and couldn't see Minnie. He would say, "I have got to go

in that house at night and dinner, cook my little bite at dinner,
and Minnie is not here." She has been leaving him off and on
since shortly after the marriage. She went all the time, and
towards the last she staid at her father's the biggest part of the
time. I don't know what he was intending to do. He would
send for her to come home and they would not let her come, and
Mrs. Armstrong would go for her and they would not let her
come; I mean her mother and father would not let her come.
They were the real cause of her keeping away from him. They
put it on Minnie. When Mrs. Logue was there and her daugh-
ter was sick and her son was sick, and my son was sick at the
same time, she put a good deal of work and labor on my son,
more than was right in his condition when he was sick. She
didn't have any mercy on him at all; she treated him with very
little consideration, and it hurt my feelings. He was a hard-
working man and did his part by his wife, more than he was able
to do, and attended to his business well. His business was farm-
ing. I suppose he was a good farm-hand; that was what the
neighbors said. He never had spasms since he was a little boy.
I allowed those spasms were the kind that children frequently
have; I have seen other children with the same kind of spasms.
I remember the last visit to my house of Minnie and Ab. She
went to her mother's from my house. Ab was at my house with
her when she left. I don't suppose they were mad then. He
asked her to go by home and see her folks and come on home;
"I will have some hands in the morning, and I would like for
you to get home." That's the way they talked. They came to
my house Saturday evening at four o'clock, and remained there
until Sunday afternoon. While they were there he treated her
just as kind as he could, and was affectionate to her. He in-
sisted on her promising to come home after she went to her
father's, and she would not promise him, because she told me the
night before that her mother was not going to let her go home.
I have heard him mention once or twice, I know, that he was go-
ing to get Minnie up there and keep her at home, so lonesome,
and "I had rather be dead than alive, that way." I believe they
were virtually the cause of the whole trouble; not her father so
much as her mother. Her mother was the whole cause of it,
and he was the kind of a man that mostly went by her say so.

Mrs. Sarah E. Johnson testified: I visited the house of Ab-Taylor and his wife several times during the month of March. The accused called me to come and see his wife. I went there during the month every two or three days, sometimes every day. His wife was very low and dangerously sick; she had had a child and had milk leg and fever. Taylor waited on her while I was there. He was right there all the time. She called on him all the time. She called on him and her mother in pref-erence to any one else; she called on him to hold and nurse her. He was not well but was poorly a part of the time. In that condition he waited on her whenever she called on him. I have been there day and night. He did anything she called on him to do, and was ready and willing; would wait on her in any way. She had to be held up in bed; he would do it. I saw him a great many times sitting behind her, crying, holding her; he and her mother gave her medicine and food. I have known her to call him when he was at the table. He would go and wait on her without eating. Never saw him sleep much. He would lie down and rest in the same room. He was wakeful and attentive; in and out all the time when not nursing her. Never saw him mistreat her or give her a cross word. He treated her as kind as a man could treat his wife, and did all he could for her. He acted nicely and sensibly while I was there. Seemed to be thoroughly at himself, and to know how to nurse her. He sat behind her the biggest part of the time, day and night.

Mary Sanders testified: I knew the accused and his wife. I went to their house when she was sick. Taylor came and hired me to wait on her in March of this year. She was very sick during the month, in a serious condition. I staid there until the 29th; then her father came and she went home with him on the 30th. Her mother and Mr. Taylor waited on her and gave her medicine and food. Taylor did what he could. There was a good deal to do. She was helpless and had to be lifted about. He left his crop and staid and waited on her. He himself was sick a good deal of the time. He was not regular at his meals, and must have lost a good deal of sleep from his attention to his wife. He was anxious, uneasy and was very much troubled about her. He cried a good deal. She had

spells of weakness when it looked like she would die. It troubled him very much, and he cried every time she had a spell. He was kind and affectionate to his wife; they were always loving. I saw them together after she got over her dangerous spell. He would treat her as good as he could. They were very affectionate towards each other. Mrs. Taylor preferred the accused to wait on her, always. I did not notice anything unusual or remarkable about him, except he was sad. Did not hear accused say anything about her going home with her father. I saw him after she went. He did not like that much. He took it pretty hard. It did not make him mad; he didn't rear; he did not like it, but he took it out in crying. Whenever I did see Mr. Taylor he was looking mighty curious. I noticed Taylor being shabby, wouldn't shave, and going with his clothes half put on him. He didn't look brave like he did when his wife got sick. He went about with his head down, moping about. He was not noticing anybody. I noticed whether he spoke to people or not. We all laughed about it. If you spoke to him he would speak, and if you didn't he would speak; he would not talk. He looked like a man whose wife had left him. I imagine he looked like a man whose wife had left him; he looked like a man that had lost his family.

Mrs. Laura Armstrong testified: Knew accused and his wife. Visited Mrs. Taylor a number of times after the birth of her child, while she was sick. During that time Taylor was very attentive, devoted and affectionate to his wife, extremely so. Frequently the wife insisted on the husband waiting on her, and refused attention from others. He gave about all his time to his wife, night and day, administering medicine, food and stimulants, although part of the time he himself was quite feeble. Have known him to quit his food to wait on her, and then not return to eat; he lost much sleep. At intervals would work around the house so as to be on hand to serve his wife. When accused waited on his wife he cried a great deal. He was an extremely poor man, but provided for his wife in all particulars the best he could.

A duly certified copy from the records of the court of ordinary of Bibb county was introduced, showing that William

Taylor, on the 30th day of December, 1893, was adjudged to be of unsound mind, and was committed to the lunatic asylum, on proceedings instituted under the code.   These proceedings were had on affidavit to the effect that Taylor was of unsound mind, and the affiant apprehended and had reason to apprehend that the public safety was in danger by his being at large.

J. J. Johnson testified:   Knew Taylor and his wife.   Not related to either.   Visited their house when Mrs. Taylor was sick.   She required careful nursing.   Taylor did most of the nursing when he was able; was sick part of the time himself. Even when sick he remained close to her.   I saw him nurse her a very great deal.   He was affectionate and kind to her.   I thought he was anxious and uneasy about her all the time.   Apparently he was in a great deal of trouble, and showed it by crying.   He had a pallet in the corner to sleep on.   Every time he was called he would come.   He acted like anybody else would whose wife was about to die, I thought.

Mrs. Frances Herron testified:   Knew the accused and his wife.   Not related to either.   Taylor came to get me to go and stay with his wife, who I found was not well when I got there. The baby at that time was about three months old.   I remained three weeks.   Mrs. Taylor was not in bed when I went.   Her father had carried her to town to the doctor and brought her back.   Taylor was as good to his wife as he could be, as kind as he could be.   Never said a harm word to her, and they seemed to be happy.   He was not at home much, but on the farm at work; but when at home they were just as peaceable as could be.   At night they sang together.   They were together when he was not at work, and sought each other's company.   Saw many acts of affection between them, and never saw a more affectionate and happy and loving couple.   Never knew him to be rough nor quarrel with her, nor she with him.   He waited on her.   He employed me to go there.   When she left to go to his mother's she and I went together there.   Taylor acted like a good sensible husband.   I did not see anything out of the way in his actions.   He did not cut up like a bad-tempered man, or like a crazy man.

Charles Nelson testified:   I am the brother-in-law of accused.

I married his sister. I have known him about seven years. Lived at the same house with him about three months last fall. He was then married. Did not see much wrong of Ab and his wife when they lived at my house. They lived kindly and affectionately; quarreled very little. They would quarrel a little whenever she wanted to go to her father's. He would persuade her not to go; she would contend to go, and raise a quarrel with him. He would not abuse or mistreat her,—nothing more than to persuade her not to go. They never quarreled about anything else. He was affectionate to her. They were always loving. Never heard him speak an unkind word to her. Never knew him to strike or abuse her, nor to neglect her. She was not altogether loving and affectionate towards him. All the trouble that I saw was her wanting to go home to her father's. She would pout when he would object. Outside of this there was nothing on her side that I know of. I have been to their house when she was sick, a number of times. I lived about fifty yards from them. The accused was sitting behind her, holding her a great portion of the time, and waiting on her, giving her water and medicine and food. During this time he slept and ate very little. He was sick himself during the time. She would frequently call him and he would go immediately and wait on her. Sometimes she would call him from the table. He was very anxious about his wife, and showed his anxiety. I never heard him talk but little at that time. He exhibited his fear and grief and anxiety by crying. He did a good deal of crying. I saw him crying by the bed once or twice, and once in the yard. He thought his wife was dying. He made all the provisions for her he could, in the way of medicine and food. He was a poor man, got his living by labor, worked on the farm with Mr. Armstrong. I saw them at home but little when she was well. They got along very well, and seemed to be happy. I have seen Ab when his wife was at her father's. There was a great deal of difference in his appearance then and when his wife was at home. He had a dull countenance and had little to say, and would talk about nothing but his wife going home and not staying with him. If I introduced other subjects he wouldn't notice them. When his wife went home he would

come to my house. He said he could not help from grieving about it. He did not see any cause for her to go. When she was gone did not seem to have anything on his mind but her, and talked about nothing but her going away. He said he did not think she ought to go off and leave him, and he persuaded her not to go, that he had nobody there to wait on him and help him, and that she ought to stay with him. He did not speak harshly of her, nor abuse, nor condemn her about going. There was a difference in his appearance and actions when she was gone. He was nervous, couldn't hold himself still when he was talking about her going home to her father's. He was in his nervous condition every time she went. He would keep talking about it and pay no attention to any other subject. He would go to my house to get his meals when he would not have time to cook. I noticed he did not talk right when he was talking about his wife going off. He would speak things that did not sound right; he would have a nervous disposition. Never knew them to quarrel about anything except her going away. She staid away too much. She left him there where he had to wait on himself, and he complained about it, and said she ought to be there to help him. He never got mad about anything else that I know of, except her going away. The longer she staid, the less he liked it. He did not make any effort to get her to come back. She always set a time to come, and he would look for her at that time. He would send somebody after her to get her to come back. He did make some effort to get her back, only he did not go himself. He sent me once. He was a pretty curious sort of a man. He was a man that would talk loud. The last conversation I had with Ab about her being off and coming home was the 3rd of July. He asked me, did I reckon she would ever come back home any more. I told him I did not know whether she would or not. This was at my house about twelve o'clock. He then turned and walked out. That was all he said. He said that he and her mother and her father could not get along, and he did not like to go up there; they did not like him and he did not like that, and neither liked the other. That state of affairs continued for some time. He seemed to be nervous, and talked about his wife, and said she ought to be home helping him.

George Burnett testified: I knew Ab Taylor and his wife; lived about 300 yards from Taylor; saw him occasionally during the year. He seemed to be of very good disposition when his wife was at home, and acted like he was glad, wanted to do everything sho asked him; and he was jolly and wanted to laugh and talk and joke, and he and I would frequently tussle. When his wife was away he did not have much to say, he would act like he did not know what to do, act strangely, be first in one place and then in another; at times he worked, and then would quit and go to the house; when he came in contact with other people sometimes he would speak and sometimes he would not. He didn't act that way when his wife was at home. Noticed him plowing, he had peculiarities; he would stop, talk to himself and murmur to himself as he went along plowing. When his wife was at home I did not notice that. When I spoke to him and asked questions he replied in a natural manner, perfectly sensible. He looked like he was downcast on account of her leaving him, and very much bothered about her going off. When she was away he did not joke with the boys; he would not wrestle. When she was at home he would joke and wrestle. I never went to his house when his wife was at home. Have heard him mumbling to himself a number of times during the year.

Frank Bartlett testified: Knew Ab Taylor and his wife for eight or ten years. Lived with Mr. Armstrong this year, three or four hundred yards from where the accused lived. Have seen but little of him except in passing. Have seen a little peculiarity on the part of the accused when he was at work. Seemed to be troubled in some way, would not be attending to his work. That was when his wife was gone. Everything worked along smooth when she was there. I noticed the difference in passing. He wouldn't work and pay attention to his farm when his wife was gone, as if she was there; did not work regular. Have heard him talking when he was plowing; did not understand him,—nobody there; but never noticed him doing that way when his wife was at home. He acted like he was in trouble. I had taken him to be a pretty sensible man, man of good sense. There was nothing crazy about his work that I

noted.  He would get downcast and worried whenever his wife
would go off and leave him.   It looked like the least little thing
would worry him then.

Armstrong testified: Knows the accused; saw his wife once
or twice.   Not related to either.   They lived on a place of
which witness was in charge this year.   Met Taylor first in
April last.   Noticed peculiarities in his conduct.   His actions
were a little strange for a sane man, since I became acquainted
with him.   He usually went with his head down,—walk right
up against you before he would speak.   Would talk about his
family mostly, his trouble with his wife.   Talked about killing
himself, drowning himself.   Was in trouble.   Would talk but
little about anything else.   I would talk about his crop; he
would reply that when he got his family at home and settled
down he would show me how he could work.   It seemed when
he was talking to me that the trouble that existed between him
and his wife and people would be on his mind.   He frequently
talked about killing himself to get out of trouble.   He always
spoke of his wife in a very kind manner.   He blamed her father
and mother for the trouble, not his wife.   He said he didn't
blame his wife for anything.   She was an inoffensive one, one
of the easy kind that could be led off easy, persuaded.   When
his wife was gone he was in a restless state, would leave his
work and be gone for a day.   I have seen him in plowing stop,
walk back as if looking for something.   He would not pick up
anything.   He would skip about in his work.   He worked well
when his wife was at home.   Never saw him with his wife but
once or twice.   He once asked me to go by his house and see his
baby; I went in and had a little talk with his wife; he seemed
to be contented and so expressed himself.   I did not notice any
of the moping about while she was there; I could frequently
hear him singing at night late, ten or eleven o'clock, and on one
occasion I heard him before day holloing, singing and praying.
That particular night I listened two or three hours.   The last
time, it was about two or three o'clock in the morning when he
attracted my attention.   He would commence right after sup-
per-time.   I don't know whether he went on that way all night
or not.   I couldn't understand the words he was singing, I could

hear the tune. I thought he was speaking like a man with a mind that was not right. When I first met him I thought his mind was weak. From what I have known of him and the way he was acting, I would judge that his mind was unsound and badly diseased. I don't know that I ever noticed any peculiarities besides those mentioned. I saw him Saturday before the killing. He was coming in from work. Eli Taylor came and asked me if he could get a mule to go after Ab's wife. I told him he could, and he saw my boy hitch up the spring wagon, and he asked him if he wouldn't drive him by and bring her, and he said he would. When my son returned he didn't bring his wife, and when the accused found she did not come he asked my son if she came, he said, "No," then he asked why, and he said her mother wouldn't let her come. Then he said he would go after her himself, and he said he was going to bring her when he went, and if these old people interfered with his bringing his wife away, he would kill them. That was the language he used exactly. At that time he was perfectly crazy and wild. He turned blue almost. He was the maddest man I ever saw. He was as nervous as I ever saw a man. At that time he was attempting to help unhitch the mule from the wagon. He was all to pieces. He couldn't hold on to anything. He said if those old people interfered he would kill them,—his mother and father-in-law; he said they had worried and tormented him about his family, that he couldn't stand it any longer, that he had rather be in hell. I said to him, "That is a harsh statement. I have seen more of the world than you, and you say you are in great trouble, and if you carry the remarks you are making into effect, they will get you into more trouble. Get all that out of your mind. If they have made up their minds they don't want this woman to live with you, and she don't want to do it, I don't know of any law to force her to live with you; and if she don't want to stay, I wouldn't want her to do it. You went to the court-house to get your privilege, and that is the place to go and get separated." He didn't say anything to that, but talked awhile. Sunday morning he came and asked if he could get a horse and buggy to go after his wife, and I said, "How long are you going to be gone?" He said, "Until ten or

or eleven o'clock." That was the last time I saw him. After the singing until two o'clock in the morning, I met him the next day and I said to him, "You must have been very happy last night," and he asked, "Why?" and I replied, "Your singing and praying." He said, no, he was troubled. I told him he ought to kick off all of this trouble business. My son went after his wife for him and he returned and told Ab his wife hadn't come, and he supposed the reason was the old people wouldn't let her. That was the time he got so mad and flew all to pieces. He was intensely angry at the time. The same evening I advised him that if his wife didn't want to live with him, to leave her alone. That was the evening before the killing. He said his wife wanted to stay away from him on account of her father and mother. The next morning he got my spring wagon and started off. I did not see Eli with him at the time they started. They left while I was at breakfast. On that Saturday evening he talked in an angry tone, when he was talking about his family. When he brought up that subject he talked like a man off his hinges. He never expressed dislike for his mother-in-law and father-in-law. He did not like the way they were meddling with his family. He said if they separated him and his wife he would kill them. He made that remark Saturday afternoon. Next morning he seemed to be as calm as usual, but was in a melancholy state, downcast and troubled. He seemed to be in a state of unrest all the time. I have been so myself. Men in such condition do not act all alike. The stronger the mind, the better able the man is to bear it. I have never known a sane man to act like this man in my life. I think a man that would be up and praying at two or three o'clock at night would be crazy. He wouldn't do it when his wife was at home. I think that he was not of sound mind, because I heard him singing at two o'clock in the morning, and his actions in walking up and down the road. He nearly run into me once or twice. He was not a raving man, or anything like it. Was a good worker. I think that a man who would skip from a place that was grassy, and go over to where there was none, was not sane. I think he was trying to skip the grass. He never showed any signs of laziness. He skipped coffee-weeds and crab-grass and went

where there was not much grass. He would sing late, and hoe grass in spots, and get mad when the old lady and the old man wouldn't let his wife come home. The longer she staid away the harsher he got. He held his head down oftener. His mind seemed to be in a worse state, in the manner I have mentioned.

Emory Jackson testified: Knew where Taylor and his wife lived this year. Visited them a few times, several times at night. Taylor was there and so was his wife, the latter being in a feeble condition, apparently very sick. Taylor and the neighbors were waiting on her and were very attentive in nursing her. He was very kind. I saw him crying several times. Her demeanor towards him was very kind. She wanted him to wait on her principally. She wouldn't let anybody nurse her but her husband a great deal of the time. Apparently she was very ill. Taylor acted like any man whose wife was sick. I do not know of anything remarkable about the way he acted.

E. S. Smith testified: I knew accused. I knew Charles, the brother of the accused, who was living and did not have mind enough to take care of himself. I also knew the cousin of the accused, William Taylor; he was sent to the asylum. I have known the accused since he was born, but little of him since he was a man. I would say that during boyhood his mind was impaired. He was rational at times and at other times not. If he was disturbed or undertook to meditate, his reason would become dethroned, and I would not think he was of sound mind under those circumstances. I considered the mother of the accused a weak vessel. She had hobbies and foolish ways, such as a person of unsound mind would have. I have not seen the accused for six or seven years, until this trial. I have not been with him to any extent since boyhood. Then he acted, ordinarily, like other persons, unless he became excited or worried; then he acted in a different manner; get wild, and if he did a thing, after he got over one of those mad fits or wild fits he wouldn't recollect it. When he got excited he was more excited than other people. He appeared like a madman. He would rear and tear and curse when he was not more than five or six years old. Nobody guarded him, but I never heard him referred to by any of his associates except as a fool.

W. J. Herron testified on direct examination only in reference to the mental condition of Mrs. Martha Taylor, to the effect that she had spells and acted in a very curious manner. On cross-examination he stated: My wife is her half-sister. One of the children of Mrs. Taylor was an idiot, but nothing was the matter with the rest of the boys that witness knew. The spells which Mrs. Taylor had came on occasionally. Witness had been at the house of Mrs. Taylor, when accused and his wife were there. Doesn't know whether there is anything the matter with the accused or not; never saw anything the matter with him.

W. S. Holley testified: Knows the accused. He arrested him. At the time he arrested him he was stabbing himself in the breast and looking at his person where he was trying to make the lick; had his shirt, coat and vest open. This was in Williamson's peach-orchard. He saw me before I saw him. I was following a track. When I got to him he was badly frightened, was bleeding freely and seemed to be considerably exhausted. The first words he spoke were to ask me to carry him to his mother's house, that he would be dead in a few minutes. He said he was not sorry for anything he had done except trying to kill himself. He said he had killed his wife and that the knife I got from him was the knife that he killed her with. He said he was satisfied, he had done what he had been wanting to do at the time he was talking about killing his wife. I had a warrant for him. Am the constable in the district. This was on Thursday morning after the killing was on Sunday. I had been hunting for him during that time. When I went up to him he did not act the part of a man out of his mind. He seemed to be weak. He had been lying out and taking the rain and was wet. He seemed to be frightened and told me he was. He said that he had been told that the crowd was going to lynch him, that he was nearly scared to death. He talked about his brother Eli and asked if I thought they were going to get him into any trouble over it. He said he hoped they would not, that Eli was a good boy and didn't have anything to do with it. He was arrested on Thursday morning, about two miles from Logue's, and about three hundred yards from his mother's, and about four miles from where he lived.

R. L. Langston testified: Knew the accused about sixteen years ago. Knew him when he was a little boy. He was always strange. Couldn't tell what was the matter with him. Did not seem to be real bright, was easy to pick at, and when he got mad was hard-headed, and when he got angry he could not control himself at all. We would have to get out of his way when he got mad. Afterwards he would claim not to recollect anything about it. At one time he got me down and like to have injured me seriously. I had been picking at him, and the longer I picked the madder he got. When he got mad he wanted to fight, and would fight. I was too young at that time to consider whether he was bright or not. I would talk at him to see him spit; he would slobber all over himself. After he caught me and jumped on me I did not pick at him any more. I can't say that I saw him do anything else that was remarkable.

Eli Taylor testified: The accused is my brother. He is about twenty-seven years old and I am twenty-four. I knew the wife of the accused. After they married they lived in the house with me and my mother. Got along peaceably and all right, being kind and loving all the time, and were affectionate towards each other, and never heard them quarrel. Subsequently they moved to the Armstrong place. I went there while his wife was sick, and once or twice since. When his wife was sick they were very friendly. He waited on her and was very attentive to her, and it seemed that she would rather for him to wait on her than anybody else. He was sick a part of the time she was. His conduct was very loving towards his wife. I saw him crying several times. After she got better and up he treated her as well as he could, was kind and loving. About two weeks before the killing I carried them from his house to my house. On that visit they acted as kindly as they could. From there I carried his wife to his mother's. When we were leaving him at my house he said he would go down the railroad and cut us off if she wanted to go by her mother's. The understanding was for her to go by and stay about an hour, and meet him up the railroad, and I was to carry them home. I carried her to her mother's but did not carry her home, because Mrs. Logue said she wanted her to stay two or three days with her sis-

ter, who was sick. When I found my brother and did not have her with me he seemed very sad; he did not look like he did before. He went back to my house and staid until dark, and then went home. Mr. Logue told me he would carry her home Tuesday or Wednesday, but she never went. It was two weeks exactly before the killing that I carried her there. During those two weeks I saw my brother from Wednesday to Saturday. I noticed that he was badly torn up, and did not think they were going to let his wife come back any more. He said he did not believe they were going to let her come back. During that time he talked about his wife mostly, and about his troubles. It seemed that his wife was on his mind. He would not talk about much of anything except that. Sometimes he would talk a little about other things, but would go right off about his wife again. He said he believed he would get along all right if he could get his wife back, but that he did not believe she was going to come back. He acted strangely and looked strange. He would stop his plow, and said he didn't have any heart to work and could not work. I saw him Saturday before the killing. He was talking mostly about his wife, getting her back home, and wanting me to go after her, but he didn't believe she would come. I saw him along through the day. I did not see him that evening and night except in passing. Didn't have any conversation with him. I stopped my plow about three o'clock to go after his wife, and asked Mr. Armstrong who was going that way if he wouldn't go by and get Ab's wife. After Armstrong and his wife came back, and Ab's wife didn't come, he seemed to be all to pieces. He cursed and took on powerfully. He said he was going after her next morning, and seemed to be excited when he was talking about it, and nervous. I told him his wife would come back all right; he said no, that he didn't believe they were going to let her come back. After he got through cursing, I saw him go into his room, before he went to bed and kneel down and pray. Just before he prayed he had been cursing; he cursed me, himself, Logue and his wife. The next morning my brother and I got up and hitched up the wagon and I went after her. I told him to get off and go to my house, and I would go and bring her there, and he could talk to her; and I went by

Logue's. My brother did not go. The understanding was he was going up the railroad to my house, and I was going to get his wife up there, and he was to take her and carry her home. When I went to Logue's I didn't get his wife. When I failed to get her I started to my house. I met my brother at 100 or 150 yards from Logue's. When I met him he asked me where was Minnie, or what she was going to do. I told him they wouldn't let her come. He started on. I jumped out of the wagon and told him to stop. I saw the pistol. He said if I didn't stop he would shoot me. He jumped up and said, "God damn my soul!" and went running towards Logue's house. I went and got in the wagon and turned it around and followed him. I did not see him any more before he got to the house, but saw him in the porch as he went in the door. I was going on and I heard a pistol fire. I was then turning out of the big road, going up to Logue's house, and was 25 or 30 yards from the house. When the next shot fired I was getting out of the wagon. I then run in the house. When I got there my brother was snapping the pistol at his wife, she was running around over the house, he after her. He jumped out of the back door and I did so and took the pistol from him. I caught hold of his right arm and thought I would carry him to the wagon, but he slung loose, run in the house, and when I got there he was cutting his wife. After that he went out of the door. I caught hold of him and carried him to the wagon. When I met my brother and told him his wife wouldn't come, he looked like a wild man. After that I carried him up to my house. I took out the mule and he went in the house. I heard mother holloing and screaming, and I went in and he came out of the door. I put her to bed. She had fallen on the floor. I don't know what transpired between him and mother. He went off a little piece and came back over to my house from there. On Monday evening we tried to get him to let us take him and bring him to jail. We heard that they were going to lynch him. He would not consent. He refused to talk. Down at Armstrong's in the afternoon, when Armstrong tried to get Ab's wife to come back, when he reported that to Ab, that she would not come, Ab took on a great deal. He acted like he was angry and all to pieces. He cursed old man

49

Logue and everybody else. He said he was going the next day and get her, and if they didn't let her come he was going to kill Mr. Logue. The next day after I went up for her, I met Ab and told him she was not coming; he cursed and started up the road and put his hand in his pocket. When I got there old man Logue had already been shot. I only saw my brother stab his wife three times. I did not know there was going to be trouble at old man Logue's when we started up there. I thought there would be a fuss. I did not have any idea there would be a killing. I didn't know he was going to kill anybody. He did not make any effort himself to hide. I controlled his movements. My reason for hiding him was that I saw by the papers they were talking about lynching him.

*For the State in rebuttal,* M. J. Newberry testified: Have known the accused nearly four years; he has worked with me two and a half years. I had opportunity of seeing his conduct. He acted like a sane man to me. I considered him the best farmer I had. He had the best judgment of any man on the place. He had two brothers there. His judgment was a great deal better than theirs. I saw him occasionally before the killing; he seemed to me to be sane.

J. J. Amason testified: Knows the accused. Had worked on his farm two years. Had opportunity for seeing and observing him. He did not conduct himself in a strange manner, was a pretty straight fellow, faithful worker, was about grown at the time, was of sound mind, because I was with him every day and couldn't detect anything otherwise. It has been ten years since he worked with me. Have seen him occasionally since. Never saw anything wrong with him. Knew him after he was married. Seemed to be of perfectly sound mind.

George Dillon testified: Accused worked with me a short while in 1897. Am not an expert; but accused was a good farmer and a good farm-hand.

Dr. C. D. Redding testified: Attended Mrs. Taylor when she was sick. Accused was also unwell during that time, and I pre-scribed for him. Knew the accused well; have known him three years or more. He has not been a man of unsound mind since I knew him. Have seen him twice a month for two or

three years. When I prescribed for him it was for a little nervousness, and he was complaining of a headache caused from being up during the excitement at his house. Minnie L. Taylor, wife of the accused, came to her death from stab wounds made with a knife. The wounds were mostly in the back; one right in front. I should not have considered any one of those wounds mortal. It was the general effect on the system, the nervous shock that produced the death. Neither of the wounds struck any vital part. Knew Mrs. William Taylor. Called to see her after this murder. She was nervous and excited, and needed something to quiet her. There was no fit or anything of that kind. I considered her a woman of very good judgment. I saw accused soon after he was arrested. Didn't consider his wounds serious at all; thought they were made with intent to commit a suicide, and inflicted by the person himself. When I visited the wife of the accused when she was sick, the conduct of the accused towards his wife was very affectionate and very kind, and he was much interested in wanting her to get well. He was very anxious about his wife, and I thought much concerned. He was devoted and attentive to her when I was there, and tender in his conduct. I can't say that he was extremely attentive and affectionate. He did all that was required of him; was anxious that she should get well and live.

Frank Roquemore testified: The dead woman was my cousin. Have known the accused since I was large enough to recollect anybody. My acquaintance continued with him until five years ago. He appeared like any other man, sound.

Mrs. Nancy Herron testified: The accused is my nephew. I never noticed anything about him to show that he was a man of unsound mind. Never was in his company much. I thought he had very good sense.

*For the defense, in surrebuttal,* Samuel Armstrong testified: Knew the accused and his wife. Have seen Taylor when his wife was away from home. Seemed to be in a great deal of distress and trouble. Talked with him during this time. He would refer to his wife and her parents causing the trouble between them. I went after his wife for him on Saturday afternoon, before the trouble. I did not get his wife. After I failed

to get her I went back home.   When I went back accused lost all control of himself and got nervous.   He tried to help me un-hitch, but was in such a jerk that he lost control of himself.   He said if there was a poor man in trouble he was one of them.   He moaned, grumbled to himself about the mistreatment the parents had caused him.   I never heard him utter a word against—he did not make any threats against—her.   I heard him make the threat that he did not want to go up there, because he knew if he did, old Logue would begin to abuse him, and that he had stood it as long as he could.   I told him that his wife said, come up and spend Sunday.   I heard him say that he did not want to go up there, on account of the abuse of Mrs. Logue.   He said he knew they would cause him to shed blood if he went up there. He spoke of shedding Logue's blood.   He seemed to be out of trouble when his wife was at home, and in good heart, and went about his work in a cheerful way.   He said every time he went there they began to abuse him about living on Armstrong's place.   It seemed they wanted him to live there where his wife would be at home.   He would tell the reason they were pulling her back and forth.   They wanted him to live with them, and he did not expect to do so.   That was the first of the year, before he set in.   It was on Saturday night that he said that he wouldn't stand it any longer, and I suppose the cutting took place the next day.   That is my understanding.   He said if he had any more of that it would cause bloodshed.

The original motion for new trial sets out the following grounds: (1) Because the said verdict is contrary to law.   (2) Because the said verdict is contrary to the evidence and without sufficient evidence to support it.   The grounds of the amendment to the motion are as follows: (1) Because insanity at the time of the homicide being the defense, and defendant's counsel contending before the jury and the court that the proof showed that the defendant loved his wife (the deceased), and was unusually and tenderly devoted to her, and that he could have had no sane motive for killing her, that he had no animosity or ill will towards her, that defendant at the time did not have sufficient reason to distinguish between right and wrong, and that if he did, he was at the time laboring under a delusion that so over-

mastered his will that he was unable to form in his mind an intent to commit a crime, the court erred in charging the jury as follows: "The popular idea of malice, in its sense of revenge, hatred, ill will, has nothing to do with the subject (legal malice). It is an intent to kill a human being in a case when the law would neither justify nor in any degree excuse that intention, if the killing should take place as intended." (2) The court erred in charging the jury as follows: "If the jury are satisfied beyond a reasonable doubt of the guilt of defendant of the offense of murder, and do not desire that he should suffer the death penalty, the form of your verdict would be, ' We, the jury, find the defendant guilty, and recommend that he be imprisoned in the penitentiary for life.'" · "If the jury find that the evidence establishes beyond a reasonable doubt that the defendant is guilty of the offense of murder, and do not desire to reduce his punishment to imprisonment in the penitentiary for life, but do desire that he should suffer the death penalty, the form of your verdict would be, ' We, the jury, find the defendant guilty' "; this defendant respectfully submitting to the court on this motion for a new trial that the question of mercy in his case, under the law, was not a question of desire on the part of the jury as to whether defendant should suffer the one penalty or the other. (3) Because the court erred in charging the jury as follows on the same subject, that of the reduction of the punishment: " It is not controlled by any rule of law or evidence, it is not controlled by anything except the wishes of the jury trying the case"; this defendant now contending that such instruction was an erroneous construction of the statute. (4) Because the defendant says he not only introduced evidence of his own condition, conduct, sayings and doings, peculiarities and troubles, appearances, grievances and afflictions, as shown by the brief of file with this motion, but that he also introduced evidence showing (as appears in said brief) insanity in his mother, in his brother Charles and his first cousin William Taylor, for the purpose of establishing insanity in defendant's family, as evidence of his own insanity at the time of the killing, in connection with all the other evidence in the case, and his counsel in arguing the case before the jury most earnestly stressed the evidence

of insanity in the family; and yet the court, in its entire charge to the jury, took no notice of this line of testimony, but omitted the same entirely. (5) Because the defendant's counsel, in their argument before the jury, most earnestly stressed all the evidence (as contained in said brief) of defendant's condition, conduct, sayings, doings, peculiarities, troubles, appearances, afflictions and manner of the killing, and the appearance and conduct of defendant at that time, and the absence of any sane motive for such a deed, as going to show defendant's insanity at the time of the killing; and the court, in all of its instructions, failed to advise the jury as to any of this evidence, or as to any of the evidence in the case introduced by defendant to show his insanity, except by submitting the entire case in a general way, as shown by the charge, which is of file as a part of the record in this motion duly approved by the court.

1. The question raised by the assignments of error set out in the first two grounds of the motion is, is the verdict contrary to law and the evidence in the case? So far as the fact of the homicide is concerned, that is established to have been done by the plaintiff in error beyond all controversy. There is no contention as to the details which accompanied the act, and which are brutal and horrible in the extreme, and which, if the plaintiff in error at the time he cut his wife was possessed of a sound mind, must justly bring upon the perpetrator the severest punishment known to the law. It was not contested that the plaintiff in error killed his wife at the time and in the manner set out in the bill of indictment. The only defense urged in his trial was, that he was not legally responsible for the criminal act, because of mental incapacity, at the time of its commission, to form a criminal intent. It is not our purpose in dealing with the question as to what condition of the mind will free an individual who commits an act of violence, itself unlawful, from that responsibility to society and law which is imposed on all rational human beings, to discuss at any great length the many and varied theories and doctrines touching the law of insanity. The principle upon which insanity, used as a term to include all the varied forms of mental disease, bars a legal conviction for an act which would otherwise

be criminal is, that since a criminal intent is an indispensable element in every crime, a person mentally incapable of entertaining such intent can not incur legal guilt. 2 Bish. Cr. L. c. 26. The application of the principle to the facts of a particular case frequently becomes very difficult in a conscientious attempt to ascertain the truth. On the one hand, society is to be protected; and, on the other, one smitten by disease, and destitute of reason, although bearing the outward form of a man, should not be held to the same accountability to law as one who is clothed in his right mind. A learned expert in diseases of the mind says, "No cases subjected to legal enquiry are more calculated to puzzle the understandings of courts and juries, to mock the wisdom of the learned and baffle the acuteness of the shrewd, than those connected with questions of imbecility.". Ray on Insanity, §104. In the correct ascertainment of the rules which when applied will or will not relieve a person charged with crime from the responsibility of his act, another learned author, in defining insanity, has most strikingly said, "The path to truth is not necessarily upward and away, but the golden kernel is oftener found in the sands below than in the clouds above. The books disclose mighty judicial efforts to reach up and grasp the definition of insanity; the results have been a discord. Descending from the peaks to the valley, and then looking for the simple and obvious, insanity, in the criminal law, is any defect, weakness or disease of the mind, rendering it incapable of entertaining or preventing its entertaining in the particular instance the criminal intent which constitutes one of the elements in every crime." 2 Bish. Cr. Law, §381. It is not necessary, however, so far as we are concerned, to traverse the almost illimitable field of theory and speculation to ascertain the principles of law which govern when insanity is relied on as a defense in a trial under a criminal charge in this State. In the recent case of *Flanagan* v. *State*, 103 *Ga.* 619, this court, stating the proposition of law ruled in the case of *Roberts* v. *State*, 3 *Ga.* 310, as follows: "If a man has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible. An exception to this rule, however, is, where a man has reason sufficient to distinguish between right and wrong

as to a particular act about to be committed, yet in consequence of *some delusion,* the will is overmastered and there is no criminal intent.   Provided that the act itself is *connected with* the peculiar delusion under which the prisoner is labouring," said, "The doctrine of the *Roberts* case was announced directly after this court was organized and has never since been questioned or doubted by this court.   It is cited with approval in the leading works on criminal law and medical jurisprudence written in this country, and by many decisions of the different State courts. Its doctrine is the one which has been adopted generally by the modern text-writers on criminal law, and, we believe, by a majority of the State courts.   Not only is this principle approved by all of these authorities, but we think it commends itself as being sound and reasonable."   There is, therefore, no uncertainty as to the rule of law which governs this class of cases in this State.   It is: If a man has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible.   Exception: If a man has reason sufficient to distinguish between right and wrong as to a particular act about to be committed, yet, in consequence of some delusion arising from a diseased mind, his will is overmastered and he is impelled to do that act, there is no criminal intent, *provided* the act itself is *connected with* the peculiar delusion under which the prisoner is laboring.

Thus we find the law; and the question under this division of the opinion is, was the verdict in this case contrary to the law and evidence?   Did the plaintiff in error, at the time he cut and killed his wife, know that it was wrong for him to inflict the wounds?   We have carefully read every line of the evidence contained in the record, and are of the opinion that no part of it either shows or tends to show any such weakness or disease of mind as would cause the plaintiff in error not to know it was wrong and against the law to take the life of his wife.   If we take all the testimony relating to the mental condition of the plaintiff from his childhood to the day of the commission of the offense, and give it literal effect, it does not establish the affirmative of the proposition.   His mother testified that he was strange from his cradle up, and had strange and curious ways.

It was proven, to a certain extent at least, that he had a demented brother who died young, and a cousin who had been committed to the asylum. It was proven further that after he·married, when his wife was away from home, and only then, he was low-spirited, moody and absent-minded; that he was heard singing and praying at his house in the night; that he would talk to himself; that he would skip the weeds and grass in working his crop; that when plowing he would sometimes go back, as if looking for something, but pick up nothing; that he was nervous, and acted strangely. These and many other strange things he did when his wife was away; none of them when she was at home. On the other hand, while he was a poor man, he provided well for his wife; he was passionately fond of her; he nursed her assiduously when she was sick; he obtained nurses for her; he was a good farmer, a man of good judgment; and, so far as the evidence goes, while he may not have ascended high in the intellectual scale, there is an absence of evidence showing that he was registered so low as to be unconscious of a legal or moral wrong. He was certainly a man of strong passions, if he was weak intellectually. It was shown that he was a fighter as a boy; as a man, he expressed hostility to the father of his wife, and threatened in a certain event to have blood; the event occurred and he did shed his blood. We will not go further into the details, which appear in the report of the evidence. "The mental capacities of men differ. A particular mind may be weak, ill-formed or diseased,—in other words, insane,—in a degree not relieving from criminal responsibility." See 2 Bish. Cr. Law, p. 224, note 2, for many authorities cited. Even admitted insanity must, to relieve from criminal responsibility, reach the standard fixed by the law. *Loyd* v. *State*, 45 *Ga.* 57.; 42 Iowa, 264; 31 Am. R. 360. We have not found any evidence in the record which goes to show that the plaintiff in error, at the time he attacked and repeatedly stabbed his wife, did not have reason sufficient to distinguish between right and wrong in relation to that act. But it is claimed that the plaintiff in error, at the time he inflicted the wounds upon his wife, from which she died, was laboring under a delusion that his wife's father and mother were endeavoring to bring about a permanent sep-

aration between him and his wife, and that his wife was consenting thereto. It seems to us, after an examination of the brief of evidence, that it was established as a fact that the wife of the plaintiff in error remained away from his house a considerable portion of time. Of this fact he bitterly complained. It also seems that she was always welcomed at her father's home. It might be inferred from some of the evidence that her mother was especially anxious for her to be there. But, however this may be, whether the intention to cause the daughter to separate from her husband existed as a fact, or was a delusion of the mind of the plaintiff in error, neither the fact, nor the delusion under which he labored, giving to the plaintiff in error the full benefit of the exception to the rule of the knowledge of right and wrong as to the act committed, could, under the evidence, avail him anything. At most, under the evidence, it could be claimed that the plaintiff in error acted under the delusion that the parents of the wife intended to permanently separate them, and under this delusion he slew his wife. This would not relieve him from criminal responsibility. The exception to the rule which was laid down in the *Flanagan* case, supra, is: Where a man has reason sufficient to distinguish between right and wrong as to a particular act about to be committed, yet in consequence of some *delusion*, the will is overmastered and there is no criminal intent; provided that the act itself is *connected with* the peculiar delusion under which the prisoner is laboring. The proposition applicable to this case would then be this: The plaintiff in error had reason sufficient to know it was wrong for him to kill his wife, but at the time he did so he was laboring under a delusion of the mind that the parents of the wife were endeavoring to separate them and she was consenting thereto; and this delusion overmastered his will; therefore he is not criminally responsible. This can not be a sound proposition. To it must be added the qualification that the act of killing his wife is *connected with* the peculiar delusion under which he labored; the *killing* must have been connected with the overmastering delusion. It can not be parallel to a case where a man, otherwise sane, is laboring under a delusion that a friend who comes to his house is a burglar, and acting under the delusion he slays to prevent the bur-

glary; or that friends who are around him are enemies seeking to do him an act of violence, and he slays them to prevent the violence. Here the act is connected with the delusion, so that it would not be unlawful, if the facts about which he was deluded were true. The legal defect in the proposition urged as a defense is a want of connection between the alleged delusion and the act. In Hadfield's case, in which the speech of Mr. Erskine, which has since been looked to as authority on delusions of the mind, was made, the facts upon which the doctrine was applied and the accused acquitted were, that the accused had a delusion that he had constant intercourse with Almighty God, that the world was coming to an end, that he must sacrifice himself for its salvation. He became impressed therefrom with the insane delusion that he must be destroyed, but ought not to destroy himself. In order to bring this about he shot at the king in order that he might be arrested and executed. The act must, to relieve, be connected with the delusion. While Mr. Bishop says that the doctrine should be cautiously received, because delusion of any kind is strongly indicative of a generally diseased mind, he nevertheless lays down the doctrine to be: "If the defendant insanely believed something which, were it true, would not legally justify his act,—as, in the language of the English judges, 'if his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury,'—he would be liable to punishment." 1 Bish. Cr. Law, §393, citing 10 Clark & F. 200; 30 Miss. 600; 46 Iowa, 88.

We have said thus much in deference to the argument and brief of the counsel for the plaintiff in error, who without fee or reward have so faithfully and ably represented his cause in the court below and here. But we do not think that the plaintiff in error, under the evidence, can claim exemption from criminal responsibility for his act because of any delusion of the mind connected with the act. It seems to us that the evidence shows him to be a man of fair sense and judgment, passionate, strange and sometimes moody, rendered desperate in the belief, for which there were strong grounds, that his wife, instigated by her parents, had separated herself from him; and for this, notwith-

standing the great affection he cherished for his wife, he shot her father and killed her.    Some suggestions have been made by Mr. Bishop which are applicable here.    All men are erring. Mere error, therefore, does not relieve from punishment.    All have vicious propensities.    Therefore a mere propensity to evil does not excuse the doer.    All are only in a limited degree deterred from wrong-doing by fear of its consequences.    The mere fact, therefore, that one was not afraid of punishment when doing a thing does not show him to have been insane.    All are more or less regardless of the demands of conscience.    So the mere fact that the prisoner showed a hardened heart does not prove him insane.    After a careful review of the entire case, a close scrutiny of the evidence upon which the conviction rested, and a consideration of the legal principles which govern the case, we can not say that the verdict was against the law or the evidence in the case, but we think it was in accord with each.

2.  It is further contended that the court erred in charging the jury as follows:    "The popular idea of malice in its sense of revenge, hatred, ill will, has nothing to do with the subject [legal malice] ; it is an intent to kill a human being in a case when the law would neither justify nor in any degree excuse that intention, if a killing should take place as intended."    Counsel for plaintiff in error insist that while, as an abstract proposition, the charge was correct, yet, as his counsel contended at the trial that the proof showed that he loved his wife and was tenderly devoted to her, and that he had no animosity against her and no motive for killing her, and that at the time of the killing he did not have sufficient reason to distinguish between right and wrong, or if he did, he was at the time laboring under a delusion that so overmastered his will as that he was unable to form an intent to kill, the charge should not have been given.    With this contention we do not agree.    His counsel admitted the homicide, but claimed that because of insanity or an overmastering delusion, there was no criminal intent to do the act, and hence could be no conviction.    The State, on the other hand, denied the insanity, and claimed that the act was done maliciously, and was, in law, murder, for which the defendant was responsible.    The clause of the charge excepted to was a part of the charge which

dealt with malice as a necessary ingredient of the crime of murder. The immediate words which preceded the particular part to which exception is taken are: "The legal meaning of the term malice is not confined to particular animosity to the deceased, but extends to an evil design in general." The jury were sufficiently instructed as to the law of insanity as a defense for crime; and it was proper and appropriate also to charge the law relating to murder, which necessarily involved explanation of what is malice necessary to support a conviction for the offense. We consider the charge complained of good law, and appropriate to be charged in the case.

3. It is further complained that the court charged the jury as follows: "If the jury are satisfied beyond a reasonable doubt of the guilt of the defendant of the offense of murder, and do not desire that he should suffer the death penalty, the form of your verdict would be, 'We, the jury, find the defendant guilty, and recommend that he be imprisoned in the penitentiary for life.'" "If the jury find that the evidence establishes beyond a reasonable doubt that the defendant is guilty of the offense of murder, and do not desire to reduce his punishment to imprisonment in the penitentiary for life, but do desire that he should suffer the death penalty, the form of your verdict would be, 'We, the jury, find the defendant guilty.'" And in charging further, in reference to a recommendation to life imprisonment, that "It is not controlled by any rule of law or evidence, it is not controlled by anything except the wishes of the jury trying the case." It was contended by the able counsel for the plaintiff in error that these clauses of the charge make the recommendation to imprisonment for life, or the refusal to so recommend, depend on the *wishes* of the jury, whereas such recommendation might be exercised by the jury in the quality of mercy, or be controlled in deference to some line of public policy. It is undeniably true that if, in returning a verdict of guilty where the facts authorize a conviction for murder, the jury, being actuated by a wish or desire to show mercy to the accused, incorporate in their verdict a recommendation to life imprisonment, or do so or fail to do so from motives of public policy, this is but an exercise of the right with which they are invested. But this power to recommend,

and thus fix the punishment, does not necessarily arise from regard to public policy or a wish to exercise mercy. These reasons may influence the jury, or other reasons may. The jury is not limited or circumscribed in any respect. It is in their discretion whether they will or will not recommend, and the law prescribes no rule for the exercise of that discretion. Penal Code, §63; *Hill* v. *State*, 72 *Ga.* 131; *Thomas* v. *State*, 89 *Ga.* 480. It is possible that there may be better words to use in this connection than to say that the reduction of the punishment is to be governed by the wishes of the jury in that regard. For ourselves, we think little, if anything, can be added to the words of the statute without qualifying it. Yet, after all, as the whole matter—the recommendation as well as the refusal to recommend—is in the power and discretion of the jury, and, when exercised, no tribunal can review or call in question the exercise of that discretion, it is a matter which the wishes of the jury must determine; and we can not hold it error to so charge.

4. The last two grounds of the motion allege error because the court failed, although the proof justified it, to specifically charge the jury the probative value of evidence which showed insanity in the family of the accused; and while to make out the defense of insanity, the condition, conduct, sayings, doings, peculiarities, troubles, appearance and afflictions of the accused were shown in evidence, the court failed to advise the jury as to any of this evidence, except by submitting the entire case in a general way. An examination of the charge discloses that it was clear, comprehensive of the issues made, and correct in the propositions of law stated. The judge might have gone more into detail, but neither the justice nor the law of the case demanded it. Had proper requests to do so been made, his refusal might have afforded a legal ground of complaint. In the absence of requests to charge in detail propositions of law made appropriate by the evidence, the charge must be held to be sufficiently full, and as covering the issues of the case.

It is painful to be the medium through which the law condemns and fixes on any human being a judgment which takes away his life. This case has had our careful consideration. We find no errors either requiring or authorizing a reversal of the

finding of the jury or rulings of the trial judge;· and his judg-ment is *Affirmed*. *All the Justices concurring, except Sim-mons, C. J., and Lumpkin, P. J., absent.*