## DANFORTH vs. THE STATE OF GEORGIA

1. A special plea, which alleged that the indictment on which the defendant was about to be arraigned was never returned into court by the grand jury, but was brought in by their bailiff and handed to the clerk, who thereupon entered it on the minutes of the court, at which time none of the grand jurors were present, and that these several facts appeared from the minutes of the court, but which did not allege that the bailiff making the return was not the duly qualified officer of the grand jury, sworn in accordance with law, or that the indictment was tampered with or altered in any respect, or that, in consequence thereof, the accused suffered injury or detriment, was demurrable and was properly stricken by the court.

(a.) The history and reason of the manner of returning indictments discussed.

2. The court did not err in instructing the jury that, although they were judges of the law as well as the facts, under the constitution of the state, they should take the law from the court, and he was responsible for its correct exposition. This has been held in several cases, and while, in the case of *Ridenhour vs. State*, at the present term of the court, two members of the bench expressed dissatisfaction with that view of the law, yet the former cases could not be reviewed and reversed without the unanimous ruling of the full bench, which cannot be had.

3. There was no error in striking the special plea which admitted the homicide with which defendant was charged, but denied his liability under the law to answer to the charge of murder because of his insanity at the time the deed was done. Under the law of Georgia, this defence, if insisted on, must be made under the general plea of not guilty, and if satisfactorily made out, it would finally acquit the defendant of the charge preferred against him and discharge him.

(a.) The manner of trying such an issue in England formerly and at present, and the history and reason therefor, discussed.

(b.) The necessity for legislation in respect to criminals acquitted on the ground of insanity in this state suggested.

(c.) The Code (§§4673, 4299) provides for special pleas of insanity and the trial of the issues made thereon in cases of mental derangement existing at the time of the trial; and in no case can this special defence be put in without an averment of the existence of this diseased condition of the mind at that time.

4. There was no error in refusing to charge to the effect that the prisoner's sanity must be shown by the same amount of proof that is required to establish guilt in all other cases—that is, to the exclusion of all reasonable doubt.

(a.) This court held, in the case of *Carter vs. State*, 56 *Ga.*, 403, that the presumption of sanity should be rebutted by a preponderance of evidence of insanity at the time the offense was alleged to have been committed, or the jury would not be authorized to acquit on that ground of the defence.

(b.) The judge in this case did not restrict the defendant from using the evidence in respect to insanity, together with other circumstances in proof, to cast doubt upon his guilt, and in so doing, he laid down as lenient a rule as the defendant was entitled to.

5. There is nothing in the remaining grounds of the motion for new trial which would authorize an interference with the verdict. The charge was full, fair and impartial, and submitted fully the question of the defendant's insanity, and the verdict was supported by the evidence.

January 5, 1886.

Criminal Law. Indictment. Practice in Superior Court. Pleadings. Constitutional Law. Insanity. Before Judge SIMMONS. Bibb Superior Court. April Term, 1885.

The facts of this case are sufficiently reported in the decision. The following extracts from the charge of the court below will show the manner in which the question of the defendant's sanity or insanity was submitted to the jury:

"This defendant says to the jury that he could not entertain malice in his mind at the time, by reason of his mind being so deranged, so disordered by disease, that he did not have capacity enough to form that legal intention, to entertain malice such as I have described to you.

"Whenever the state proves a homicide by unauthorized violence, and the evidence which the state introduces does not show the want of malice, then the burden is cast upon the defendant. He assumes the burden, then, to prove that he had no malice. Now, unless the evidence of the state that proves the homicide shows that it was

done without malice, then he assumes the burden to show to the jury that it was done without malice. In this case, he assumes [it], because he says he did not have capacity enough to entertain malice.

"Well, I charge you first upon that, that the law presumes every man sane until it is made to appear to the contrary that he is insane or unsound of mind; and if a man files that plea, the burden is on him to make it appear to the satisfaction of the jury. It ought to be made to appear to a reasonable certainty that, at the time of the commission of the act, he did not know the nature and quality of the act, or if he did know the nature of the act, that he did not know the act was wrong. A person, in order to be punishable by the law, must have sufficient memory, intelligence, reason and will to enable him to distinguish between right and wrong in regard to the particular act about to be done—to know and understand that it would be wrong, and that he will deserve punishment for committing it. If the prisoner is perfectly sane as to all other things, but lacks, as to the act about to be committed, reason enough to distinguish between the right and wrong of that act, and he does not know and understand that the act is wrong, and that he will deserve punishment for committing it, he is not responsible. He may be sane about everything else, but if he is insane about that particular act, and does not know that it is wrong, then he will not be responsible.

" On the other hand, a person may be deranged as to other things, yet if he has sufficient reason or mind to distinguish as to the right or wrong of that particular act about to be committed—if he knows and understands that for committing that act he would be liable to be punished—he is responsible.

"Therefore, you will look to the evidence in this case, and see, at the time this act was committed, whether the accused had sufficient mind or reason or mental capacity to know that the act was wrong; in other words, that it was a violation of the law, and he would be liable to be punished for it. If he did not, then he is not responsible to the law, and ought not to be, because the law does not allow an insane man to be convicted, or a man who has not sufficient capacity to have a criminal intent to be convicted. But if he did know, although he may have been insane or peculiar about other things, if he did know at the time he committed that act, and he had understanding and reason sufficient to know that it was a violation of the law, and that he would be punishable for it, then the jury would be authorized to find him guilty.

"Now there is an exception to that rule, which I will give you. You will remember that it was claimed by some of the counsel in the argument that the prisoner acted under an insane delusion, an irresistible impulse, and things of that sort. That is the exception I am going to give you to the rule I have just laid down between right and wrong. If you find, of course, that he did not know the differ-

Danforth *vs.* The State of Georgia.

ence, and that he did not have capacity enough to know that he was doing wrong, you need not investigate this part of the charge. If you find that he did know what he was doing, and was violating the law, and had reason and capacity enough to know that he would be punished for it, then you may look to this.

"I charge you further that he is not responsible if the act was done under some irresistible impulse, the result of a diseased and disordered mind, which overpowered his will, taking away his power and control, and that there was no criminal intent;—I say, if all that happened, then he would not be responsible to the law; and the proviso with that is, that the act itself is connected with the peculiar delusion under which the prisoner was laboring, if he was laboring under such a delusion at that time.

"On the other hand, I charge you that if he was not laboring under such a delusion of an impulse that was irresistible, the result of a diseased and disordered mind which overpowered his will—if he was not laboring that way, but acted only from violent passions and resentments towards Landsberg, and upon real circumstances—no delusion about it—but upon real circumstances, and was impelled by no morbid delusion, but proceeded upon the ordinary perceptions of the mind—then he would be responsible, and you would be authorized to find him guilty. Now, do you understand that? . .

"Well, now, gentlemen of the jury, if, after a full, fair and honest examination of this evidence, your minds are unsettled, unsatisfied, do not know what the truth about it is, then that is what is called a reasonable doubt in law, and you shall give him the benefit of that reasonable doubt and acquit him. If your minds are legally certain, and you are satisfied from the evidence in this case that he is guilty, why, then, you would be authorized to find him guilty."

R. S. LANIER; HARDEMAN & DAVIS; S. H. JEMISON; W. DESSAU; C. L. BARTLETT, for plaintiff in error.

CLIFFORD ANDERSON, attorney general, by J. H. LUMPKIN; J. L. HARDEMAN, solicitor general; BACON & RUTHERFORD, for the state.

HALL, Justice.

The prisoner was indicted, tried and found guilty of the murder of William Landsberg, and by the direction of the jury was sentenced to imprisonment in the penitentiary for life. Upon his arraignment, he filed two special pleas:

The first set forth that the indictment on which he was about to be arraigned was never returned into court by the grand jury, but was brought in by their bailiff and handed to the clerk, and that he, therefore, entered it on the minutes of the court, at which time none of the grand jurors were present, neither their foreman, nor a quorum of the body, nor any member thereof; and that these several facts appeared from the minutes of the court, and he, therefore, prayed that it be quashed. The other plea admitted that the defendant committed the homicide at the time and place stated in the indictment, but denied that he was guilty of murder as charged, or of any other offense against the laws of the state, because he was at that time insane.

The solicitor general demurred to both these pleas, and being deemed insufficient, the court gave judgment on the demurrer in favor of the state, and ordered them stricken. The defendant then pleaded to the merits of the accusation and denied his guilt. Upon his conviction, he moved for a new trial upon thirteen grounds, and his motion being overruled and disallowed, he brought the case to this court upon bill of exceptions and writ of error.

The first four grounds of the motion insist that the verdict is contrary to law and evidence, decidedly and strongly against the weight of evidence and the charge of the court, which is set out at length and made a part of the motion. The fifth and eleventh grounds of the motion complain of error in overruling the special pleas; the sixth, seventh, and twelfth grounds relate to the powers and duties of the jury as judges of the law and facts. The last complains that the judge charged that it was their duty to take the law from the court, and that he was responsible therefor, instead of instructing them, as he was requested in writing, that, being judges of the law as well as the facts, it was their privilege to differ with the court as to the interpretation of the laws applicable to the case, and if they conscientiously believed the law to be different from that given in charge, they not only had the right to dissent

therefrom, but it was their duty to render their verdict in accordance with their own convictions and belief as to what the law was. The substance of the eighth ground is that the court erred in refusing to charge defendant's written request, that, if it was shown defendant was insane before the killing, the continuance of this mental condition would be presumed to exist at the time of the homicide, and if the state relied on the fact that the act was done during a lucid interval or while the prisoner was in his right mind, it must show by evidence, beyond a reasonable doubt, that he was sane at the very time; that it was incumbent upon the prosecution to establish the prisoner's restoration to sanity by the same degree of proof, as the law required to fix guilt in all other cases—that is to say, to the exclusion of all reasonable doubt. The ninth ground alleges as error the refusal of the court to charge that if, upon a consideration of all the facts, the jury had a reasonable doubt as to prisoner's sanity, they should give him the benefit of the doubt and acquit him.

The tenth ground alleges error in refusing to charge this request in writing: That while it is true the defendant has pleaded "not guilty," and the issue is one of guilty or not guilty, yet it is in accordance with the law to ascertain, under this general plea, whether he was sane or insane at the time the homicide was committed; and the fact that he had not filed a special plea of insanity should not prejudice his case or affect their verdict, but if they believe from the evidence that, at the time of the killing, he was insane, or if they have a reasonable doubt as to his sanity, they should, under the plea of not guilty, acquit him, regardless of the consequences. Counsel for prisoner deemed this request necessary, because counsel for the state, in concluding his argument to the jury, urged that, if defendant was insane, he should have filed a special plea alleging insanity at the time of the trial, and that failing so to do, it was trifling with the court.

The 13th and last ground of the motion excepts to the

charge of the court in so far as it made ability in the prisoner to distinguish between right and wrong, or to know good from evil, and to appreciate and understand that the act he was committing was contrary to law, and would subject him to punishment, a test of his sanity.

We shall consider the questions made in a somewhat different order from that in which they are presented by this motion.

1. Did the court err in his ruling in relation to the return of the bill of indictment into court by the hands of the bailiff of the grand jury, and the entry of the same upon its minutes, in the absence of the foreman or a quorum or any member of that body? In *Davis vs. The State*, which was argued and determined pending the consideration of this case, we held that the indictment was properly returned in this manner and by this officer. This plea does not set forth that the bailiff making the return was not the duly qualified officer of the grand jury, sworn in accordance with the law, " carefully to deliver all such bills of indictment or other things as shall be sent to them by the court, without alteration, and as carefully return all such as shall be sent by that body to the court " (Code, §3916), or that the indictment was tampered with, or altered in any respect, or that in consequence thereof the accused suffered injury or detriment.

That this mode of returning indictments and presentments which have been found by the grand jury to the court, although it has obtained in most of the circuits of this state for a number of years, is of comparatively modern origin, is admitted. Within the memory of many of us, bills and presentments were returned into court by the entire body, whose names were called by the clerk, and in that way it was ascertained that a legal quorum was present, and after consenting that the state's counsel might alter any matter of form, but not any matter of substance without their privity and consent, they made their report to the court, which was directed to

be entered on the minutes. Prior to 1857, all witnesses to be examined before the grand jury upon indictments or presentments there pending and undergoing investigation, accompanied by some of the members of that body, were sworn in open court in each particular case in which they were summoned to testify; in that year, however, the general assembly passed an act, which was approved on the 21st of December, making it lawful for the foreman of each grand jury to administer the oath prescribed by law to witnesses who might be required to testify before them (Acts 1857, p. 100); and by the Code, §3918, he is also authorized to examine such witnesses.

The motive that led to this change in the law was doubtless the same as that which induced the judges to alter the practice as to the mode of returning and receiving indictments or presentments made or found by the grand jury. The interruptions to the business of the court were frequent, both in swearing witnesses to go before the body and in bringing them into court, having them called and report in this manner their action. But apart from this, whenever a witness was sworn, there were eager eyes watching, and attentive ears listening to what was going on, and the same thing occurred whenever the action of the body was publicly announced in open court. The parties interested thus had timely warning of what was transpiring, and in numerous instances they made their arrangements to avoid arrest and thus to evade trial or to postpone a hearing of the cases charging them with offenses. The instances in which offenders were committed to jail, or were recognized to appear by magistrates, before the grand jury acted upon the charges, were comparatively few in proportion to the number of bills or presentments found at any term of the court. The failure to make these arrests under bench warrants and the announcement of "no appearance" at several terms of the court, carried them to the "dead docket," where they, in most instances, slept the sleep of death, and knew no resurrec-

tion, and as a consequence offenders escaped with impunity. The administration of oaths to witnesses was regulated by a rule prescribed by law, but it was otherwise with the formalities observed in receiving and reporting to the court bills and presentments found by the grand jury. That was matter of practice subject to the control of the court, and might be changed so as to facilitate its business and to prevent the evasion of its process. The oath taken by the bailiff attending the grand jury, for many years before the adoption of the Code, was the same as that now found in the section above cited. But when it was adopted, or from what source it was derived, we are unable to determine. That the latter clause in it was not contained in the oath administered to bailiffs waiting on grand inquests in England, whence we derived our laws and customs and much of our practice, is rendered tolerably certain by reference to their old books of practice. In the " Crown Circuit Companion," into which has been incorporated the work formerly published under the name of the " Crown Circuit Assistant," first American edition, published by A. McDurmut and D. D. Arden, No. 1 City Hotel, Broadway, New York, in 1816, we find, on page 485, this oath, which was administered to the bailiff attending the grand jury : " You shall swear that you will diligently attend the grand inquest, during the assizes, and carefully deliver to them all such bills of indictments, or other things as shall be sent to them by the court, without alteration. So help you God." Both the Crown Circuit Companion and the Crown Circuit Assistant, the title-page of this edition informs us, have been carefully revised, and such additions made thereto as modern statutes and decisions have rendered necessary. The power of returning to the court bills and presentments found by the grand jury, if not expressly given by the latter clause of the bailiff's oath, which has now become a part of our law, may be well implied from the obligation and duty it imposes upon that officer, and so far no complaint has been heard of any

detriment or wrong to parties from the practice, while it is evident that it has facilitated the business of the court, and rendered the execution of its penal process more easy and certain than it was under the former methods. For these reasons, as well as those given in *Davis's* case, *ut sup.*, we think there was no error in overruling the plea in question.

2. That the court did not err in instructing the jury that, although they were judges of the law as well as the facts, under the constitution and laws of the state, they should take the law from the court, as it was responsible for its correct exposition, has been determined by this court in several cases, and very recently during the present term, in *Ridenhour vs. The State.* It is true that two of our number express dissatisfaction with that view of the law, but not being unanimous in opinion as to the propriety of reviewing former rulings upon that subject, as we had to be under the act of the legislature (Code, §217), we were compelled to affirm those rulings, and make them the settled law upon that subject, and so they must be regarded, so far as this present bench is concerned, unless the legislature shall see proper to prescribe a different rule.

3. There was no error in striking the special plea, admitting that the defendant committed the homicide, but denying his liability under the law to answer to the charge of murder because of his insanity at the time the deed was done. Under our law and practice, this defence, if insisted on, must be made under the plea of not guilty; it goes to the very vitals of the case, and if satisfactorily made out would finally acquit the defendant of the charge preferred against him and entitle him to go without a day absolutely freed and discharged of the offense for which he was indicted.

That such a plea would, at one time, in England have been indispensable to the trial of the issue here presented, may be true, as the jury empanelled to determine it were specially sworn to try whether the prisoner was of sound

mind or not at the time of the felony committed, and a
true verdict thereupon to give according to the evidence.
Cr. Cir. Comp., 484. But in that country at the present
day, and especially since 39 and 40 *Geo.* III., about the year
1800, a different practice seems to prevail, and this special
defence is interposed only as to insanity occurring after the
commission of the offense. "It has, from the earliest pe-
riod, been a rule, that though a man be in the full posses-
sion of his senses when he commits a capital offense, if he
becomes *non compos* after it, he shall not be indicted; if
after indictment, he shall not be convicted; if after con-
viction, he shall not receive judgment; if after judg-
ment, he shall not be ordered for execution; and this
opinion is confirmed by the fact that a statute was passed
in the reign of Henry the Eighth to allow of execution of
persons convicted of high treason, though insane, which
was always thought cruel and inhuman, and was repealed
in the reign of Philip and Mary. The true reason of this
lenity is not that a man who has become insane is not a
fit object of example, though this might be urged in his
favor, but that he is incapable of saying anything in bar
of execution or assigning any error in the judgment. The
judge may, if he pleases, swear a jury to inquire *ex-officio*
whether the prisoner is really insane or merely counter-
feits; and if they find the former, he is bound to reprieve
him until the ensuing session. Provision has been made
by a recent statute for the security of criminal lunatics,
and the same rules would, probably, apply to the case of
one deprived of his reason in this latter stage of the pro-
ceedings." 1 Chitty's Cr. Law, 761, 762. The statute
here referred to is the 39 and 40 of George III., c. 94, which
provides that "where the prisoner is acquitted on the
ground of insanity, of treason, murder or felony, the jury
must find specially the ground of their verdict, and there-
upon the court must order him to be confined in such man-
ner as they think expedient until His Majesty shall give
further orders respecting his disposal." *Ib.*, 649. Our

Code makes no provision for the detention and disposal of prisoners acquitted on the ground of insanity existing at the commission of the offense, but, as before said, they are at once discharged, and go free to commit a like act upon the recurrence of another attack, with like fatal results on some other unoffending citizen. That this omission should be supplied by legislation covering the case, we think is apparent; and at the same time, it might be well to provide a place for the safe-keeping of such persons, and when thus confined, to prescribe how they shall be discharged.

The Code, in §§4673, 4299, provides, as it seems to us, for special pleas of insanity, and the trial of the issues made thereon, in cases of mental derangement existing at the time of the trial, and in no case can this special defence be put in without an averment of the existence of this diseased condition of the mind at that time; and so it was held in *Long's* case, 38 *Ga.*, 491, 507, 508.

The judge did not err in sustaining the demurrer to this plea; by that judgment the prisoner was deprived of no right. Whether he was insane or not at the time of the trial, we do not know, but are perhaps bound to presume, from the failure or refusal of his friends and the devoted and able counsel who so generously and faithfully represented him both in this and the superior court, to tender that issue and to insist upon his rights in that respect, that he was then fully in possession of his faculties. Had *Long's* case misapprehended the purpose of the legislature in enacting these sections of the Code, it is reasonable to suppose that body at some one of its numerous sessions held in the last seventeen years (the decision was rendered at December term, 1868), would have rectified even a slight mistake upon a subject of such vital importance, especially as they were presumed to know that this court was powerless to do so, except by the unanimous consent of all its members, upon an application made and leave granted to review it. This application was made, but the leave was not granted, as we were unanimously of opinion that it

was correct, and we now expressly affirm the principle it establishes. It may be true that the law needs amendment, that its terms are not so clear and precise as in penal legislation is desirable, but this is a subject with which the legislature can deal more appropriately than a court.

4. The charges requested, as set forth in the 8th, 9th and 10th grounds of the motion for a new trial, were properly refused. They lay down the rule that the prisoner's sanity must be shown by the same amount of proof that is required to establish guilt in all other cases—that is, to the exclusion of all reasonable doubt; this is somewhat varied in each of these requests, by the employment of "sanity" and "insanity" interchangeably, and as meaning the same thing, but all eventuating in the announcement of this rule, which appears to us as both unsound and dangerous. The cases upon this subject are very conflicting and in a state of considerable confusion. They are all, however, American cases; indeed, it seems that this principle here announced, as was said by Stone, J., in Boswell *vs.* The State, 63 Ala., 307, "is purely of American origin." Three distinct theories have been propounded as to the degree of evidence requisite to justify a conviction on the issue of insanity.

The first is that insanity, as a defence of confession and avoidance, must be proved beyond a reasonable doubt, and that unless this be done, the jury—the case of the prosecution being otherwise proved—are to convict.

The second is that the jury (at least to find an affirmative verdict of insanity) are to be governed by the preponderance of evidence, and are not to require insanity to be made out beyond a reasonable doubt.

A third view, sustained by several authoritative courts, is that in such an issue the prosecution must prove sanity beyond a reasonable doubt.

This is Dr. Wharton's analysis and classification of the cases decided before 1880, when the eighth edition of his work on Criminal Evidence was published. In

that book, all the cases bearing upon each of these widely conflicting views are referred to, either in the text or notes, as found in §§330–340, both inclusive *et seq.* Since that time, he has contributed to "The Central Law Journal," published in St. Louis, Missouri, Vol. 18, 402–405, a valuable article upon the subject, sustaining the view set forth under the second head of this classification, upon the authority of numerous cases determined since the publication of his book. Among others he makes the following citations: Graves *vs.* The State, 16 Vroom, (N. J.), 203; State *vs.* West, 1 Houston Cr. Cas., (Del.); Baccigalupo *vs.* Commonwealth, 33 Gratton (Va.), 807; *Carter vs. The State,* 56 *Ga.,* 463; State *vs.* Payne, 86 N. C., 609; Boswell *vs.* The State, 63 Ala., 307; State *vs.* Redemier, 71 Mo.; People *vs.* Messersmith, 61 Cal., 246; Jones *vs.* The State, 13 Tex. App.; State *vs.* Johnson, 10 *Id.,* 571. The article in the Central Law Journal, which merits for its learning, philosophic views and logical arrangement a careful study, reaches the conclusion that both in criminal and civil courts issues of insanity should be decided upon the same degree of proof. " In both courts," the author says, " the presumption is that persons coming into courts of justice are sane, and the burden of proof is on the parties contesting such sanity. In criminal courts, as well as in civil, the rule should be that, to take a particular person out of the category of reasonable and amenable beings, and to subject him to the sequestrations and restrictions imposed by the law on adjudicated lunatics, at least a preponderance of proof of insanity should be required."

In reviewing this charge which the judge of the superior court refused to give, " That if the jury, after examining all the evidence in the case, are not satisfied beyond a reasonable doubt of the sanity of the prisoner at the time of the commission of the homicide, if their minds are wavering or doubtful upon this point, not at rest as to his sanity or insanity, the prisoner is entitled to the benefit of

that doubt, and the jury are bound to acquit," but in lieu thereof charged that, if there was a preponderance of evidence in favor of insanity, they must acquit; this court, in *Carter's* case, *ut supra*, by Warner, C. J., said, " Inasmuch as the law presumes, for the safety of society, that every person is of sound mind until the contrary appears, therefore, that presumption should be rebutted by a preponderance of evidence of insanity at the time the offense is alleged to have been committed. Unless there is a preponderance of evidence in favor of the insanity of the defendant, the jury would not be authorized to acquit him of the offense with which he is charged, on that ground of his defence." The judge, however, did not, as we understand his charge, restrict the defendant in the case before us from using this evidence, together with other circumstances in proof, to cast doubt upon his guilt, and in so doing he laid down quite as lenient a rule in his favor as he was entitled to have under the law. In *Long's* case, *ut sup.*, it was held that it was not error for the court, in a criminal case, to refuse to charge the jury that, if from any cause they have doubts of the prisoner's guilt, they must acquit, and to charge instead that any cause is too sweeping, but if they had any reasonable doubts, which arose from or grew out of the evidence, they must acquit. In other cases, where the defence made was an *alibi*, we restricted the rule in a similar manner. *Landis's* case, 70 *Ga.*, 651, and cases cited ; *Ledford's* case, determined at the present term.

5. There is nothing in either of the remaining grounds of the motion which would authorize us to interfere for the relief of the defendant. The charge given to the jury which tried him was full, fair and impartial, and quite as favorable to him as, under the law, could have been asked; indeed, the dreadful malady, under which it was insisted he labored when he slew his fellow-man, was presented in every point of view which could have afforded him any relief from the consequences of his act, or which could

have cast doubt upon his intention to kill, or released him, or even diminished his responsibility on account of the deed. No exception was made to the charge in this respect, but it received from his counsel the warmest commendation and approval for its humanity and impartiality, in which we heartily join.

The character of the act itself, unless excused or palliated by the abnormal state of the prisoner's mind, is not questionable. The jury have passed upon this issue and found it against him, and we cannot conclude that they did so without evidence to sustain their action. The judge who tried the case was unable to find sufficient error in the verdict to authorize him to set it aside. It is not to be regretted, under all the circumstances, that the extreme penalty of the law was not inflicted. If it should turn out that the defendant was insane at the trial, or has since become so, his zealous and able counsel will be at no loss to find a remedy to release him from imprisonment among felons, and to subject him to such restraints as insane criminals, for their own sake as well as for the safety of their fellow-beings, should be placed under.

Judgment affirmed.