### 427.　CARTER v. THE STATE.

1. The exclusion of evidence offered to rebut the presumption of malice, in a trial for murder, is not cause for a new trial, where the defendant is only convicted of voluntary manslaughter.

2. That a witness may have made a different statement as to alleged dying declarations, on the examination by the court into their admissibility, from that thereafter made by him in the hearing of the jury, is not ground for excluding his evidence as to such declarations. The injunction that dying declarations are to be received with great caution is directed more especially to the jury than to the judge. The judge, in passing upon the admissibility of dying declarations, determines only whether a prima facie case is presented, conceding the testimony to be true. He does not pass upon the credibility of the witness delivering the testimony. If a witness makes different statements in any respect material to the proof of dying declarations, the jury may discredit him, but the trial judge can not for that reason withhold his testimony from the jury.

3. The ability to distinguish between right and wrong in relation to a

particular act about to be committed is the general test of criminal responsibility in this State. The only exception so far recognized, as to one who has reason sufficient to distinguish between right and wrong as to the act about to be committed, is where such act is connected with a peculiar delusion under which the prisoner is laboring, and where, in consequence of such delusion and without criminal intent, the will is overmastered. Intermittent insanity, caused by physical weakness or nervous disorders, is no excuse or justification for crime, unless it appears that at the time of the act committed the defendant was incapable of adjudging the quality of the act and of knowing whether it was right or wrong.

4. Where evidence as to the insanity of a defendant is introduced under the general plea of not guilty, in a criminal case, it is the duty of the trial judge to instruct the jury upon the subject of insanity as a defense. In the absence of evidence that the defendant acted under the influence of an overmastering delusion, there was no error in the charge complained of in this case. If fuller instructions were desired, they should have been requested in writing.

5. The conduct of the judge towards witnesses will not be controlled, except for such abuse of his authority as would manifestly tend to shape or unduly influence the finding of the jury. The refusal of a trial judge to allow a question to be answered by a witness can not be reviewed, unless it appears that the answer expected to such question was stated at the time of the ruling complained of.

6. While testimony that one of the defendant's witnesses, or her husband, had unlawfully sold whiskey should have been repelled upon the objection offered, that such testimony was irrelevant and immaterial, still the error in admitting this testimony is not sufficiently grave to warrant a new trial.

7. The remaining assignments of error are without merit.

Conviction of manslaughter, from Polk superior court—Judge Edwards. March 9, 1907.

Argued April 23,—Decided July 4, 1907.

*John K. Davis, J. M. Hunt, Bunn & Bunn,* for plaintiff in error. *W. K. Fielder, solicitor-general,* contra.

RUSSELL, J. The plaintiff in error was convicted of the offense of voluntary manslaughter. He excepts to the judgment refusing a new trial. The testimony in the case is extremely voluminous, but is substantially as follows: On the part of the State it was shown that after a trial in a justice's court, in which Carter (the plaintiff in error) was one of the parties and the deceased, Reed, was a witness, Reed, in company with several other persons, started from the court-house toward home. The decision of the justice's court was adverse to Carter. Reed was a witness at the trial, in behalf of one Townsend, who was the opposite party in the suit

against Carter. He was perhaps also somewhat interested in the result of the case, and concerned in favor of Townsend. The deceased was over seventy years of age and quite deaf. As he was proceeding homeward with his companions, the party was overtaken by Carter, who walked along with them about two hundred yards, during which time Carter charged the deceased with being responsible for the lawsuit against him, and used some vile epithets about the deceased. Perhaps on account of his deafness, the deceased did not appear to have heard Carter's first remarks. A little later Carter and Reed became involved in an altercation, and Carter drew from his pocket a pistol and shot Reed, who was unarmed, except with a small walking-cane, and who fell to the ground and screamed. Townsend seized Carter and the pistol, and held him until the pistol was taken from him. The evidence for the State does not disclose that Reed had any weapon of any kind other than the small walking-cane; and it was proved that he habitually carried this to walk with. He was picked up, carried home, and undressed, and no weapon was found upon him. As a result of the wound, death supervened four days later. Before his death Reed stated that he was going to die. He made this statement on the night of the difficulty, as well as an hour or two before his death. And after each of these statements, showing consciousness of his condition, he gave his version of the difficulty.

The testimony for the defendant, as to the material issues in the case, was squarely in conflict with that for the State. Witnesses on behalf of the defendant testified, that Reed made the first advance upon Carter, and struck him with his walking-stick, and that Reed had a knife in his hand. Some of the witnesses testified that they did not know whether the deceased struck with the knife or not, while others testified that the deceased struck the defendant with the knife and cut his coat upon the shoulder, and that thereupon, while the deceased was still cutting at him with the knife, Carter stepped backward and fired. There was also testimony showing that there was a mutual intent to fight and that Reed drew his knife and Carter his pistol about the same time. The defendant also attempted to show that he was insane; and testimony was permitted from several witnesses showing that he was at times wild and irrational. He further offered evidence of partial or temporary insanity, of weakness of mind in connection

with his weakened condition, and of a distortion of mind in connection with his disturbed nervous condition, and of his habit of taking liquor and narcotics impairing his capacity.

The defendant moved for a new trial upon the general grounds, and upon grounds relating to the charge of the court and the failure to charge, as well as grounds relating to the exclusion and introduction of testimony, and to conduct of the court, which is claimed to have been prejudicial to the defendant, and upon the ground of newly-discovered evidence.

1. The first ground of the amended motion assigns error in that the court ruled out certain evidence relating to the purported testimony of Carter, the defendant, at the justice's court immediately preceding the difficulty which resulted in Reed's death. The only error assigned is that the court should have admitted this testimony in order to permit the defendant to rebut the idea of malice on his part against Reed, and to meet the State's theory that Carter had ill will against Reed and was the aggressor in the fight. It is unnecessary to consider whether the exception would have been well taken if the verdict had been for murder; for, inasmuch as the defendant was only convicted of voluntary manslaughter, no harm resulted to him by reason of the court's ruling. The jury, by their verdict, found that the killing was done without malice, and the testimony repelled by the judge was only proper to be considered by the jury to induce the same result as occurred.

2. The second exception of the plaintiff in error is that the court erred in refusing to allow him to prove by one Mr. Reeves whether the witness had not heard him state from the stand that Mr. Ivins had asked him to let Mr. Reed pasture in the pasture, and that he was going to do it. He contends that this evidence was material and would have been beneficial, and was offered for the purpose of showing that he had no malice or ill will against the deceased. He further insists that this evidence would have greatly assisted him in showing the jury that he acted in self-defense and without malice or ill will. The verdict being for voluntary manslaughter, the lack of evidence showing absence of malice was not injurious to the plaintiff in error. Furthermore, the offer to prove the facts stated was not properly made. Counsel should have stated what the witness of whom he wished to ask the questions would testify. It not being shown by such statement that the witness

would have testified what the defendant's counsel offered to prove, this assignment of error can not be considered.

3. The third ground of the motion assigns error upon the admission of certain purported dying declarations of the deceased. The objections offered were, that such declarations should be received with great caution, and that the evidence should be excluded because the witness, J. H. Wilson, by whom the declarations were shown, had testified, during the court's examination into the admissibility of the testimony, and in the absence of the jury, "that such declarations were made by the deceased on Friday night prior to his death on the following Tuesday morning, and that deceased was conscious until a short time before he died and had been told that he would recover;" and, after giving that evidence, testified, "That is all he said, and he never did make any other statement; and I stayed with him several nights and had him by the hand when he died." "That is all I heard him say;" and, after delivering this testimony, the witness was present in court, heard the argument of counsel, and went upon the stand and stated that upon Tuesday night, just before Reed's death, Reed stated that he had done nothing to Mr. Carter to cause Mr. Carter to kill him." The complaint of the plaintiff in error is, that the court should not have admitted the declarations alleged by the witness to have been made by Reed on Tuesday morning, shortly before his death, because the witness had changed and altered his evidence in the presence of the court; that the court violated the rule that dying declarations should be received with great caution, by permitting the witness to testify to the jury with relation to the statements made by Reed shortly before his death.

We can not see that the ruling of the court was, for the reason assigned, erroneous. In the first place, the instruction, that dying declarations are to be received with great caution, is more especially directed to the jury than to the judge. In the next place, the judge, in passing upon the admissibility of dying declarations, only determines whether a prima facie case has been established; and so far as the credibility of the witness is concerned, a court of review can not, from the very nature of the case, control his discretion. In the third place, the court permitted the discrepancy in the statement by the witness to be proved to the jury; so that it was within their power to pass upon the questions of fact in-

volved; and if the witness had really made contradictory statements, it was in their power to impeach and discredit him thereby. After all, we see no real conflict (after careful reading and rereading of Wilson's testimony),—at least, no necessary conflict,—in his statement. After detailing to the court the statements made by Reed to him on Friday night, he proceeds to say: "That is all he said, and he never did make any other statement; and I stayed with him several nights," etc. "That is all I heard him say." The statements the witness related to the jury as having been made by Reed on Tuesday morning shortly before his death are in practically the identical language of those he repeated to the court shortly before adjournment the evening before; and if he had replied, using the same language he did, with three very immaterial changes, his veracity could not have been questioned even by the plaintiff in error. As innocence is to be presumed instead of guilt, and as the language of both declarations detailed by the witness is identical, and as the ordinary witness is not so skilled in the art of speech as to aptly choose the very word suitable to convey the shade of thought he might seek to convey, we think that the trial judge properly understood the witness as intending to say, "That is all he said, and he never did make any different statement. . . That is what [all] I heard him say." Plainly, to our mind, the only idea the witness intended to convey was that the statements he had attributed to the deceased were truthfully repeated, and that the deceased had not at any time made any other or different statement in his hearing. If the witness had been asked the distinct question, whether the deceased ever repeated these statements at any other time than Friday night, and had answered the question in the negative, the jury would have been authorized to discredit him; but the trial judge could not for that reason withhold his testimony from the jury. In the absence of evidence that the witness's attention was specifically called to the point, to discredit him because of the language used in the answer which we have heretofore quoted would be manifestly unfair.

4. In the fourth ground of the motion for new trial it is insisted that the court erred in charging the jury as follows: "The defendant sets up the further defense of insanity. A person shall be considered of sound mind who is neither an idiot, a lunatic afflicted with insanity, or who has arrived at the age of fourteen

years, or before that age if such person knows the distinction between right and wrong. The law presumes every defendant to be of sound mind, and the burden is on the defendant to satisfy the jury to a reasonable certainty that he was not of sound mind when the act was committed. The insanity which the law recognizes as an excuse for crime must be such as dethrones reason and incapacitates an individual from distinguishing between right and wrong as to the consequences of his conduct. If you find from the testimony submitted on the trial of this case, to a reasonable certainty, that the defendant at the time of the homicide was afflicted with insanity to that extent as to dethrone reason and to incapacitate him from distinguishing between right and wrong as to the consequences of his act or conduct, you should acquit the defendant of the offense charged. If you find from the testimony that the defendant, at the time of the homicide, had sufficient mind and understanding to distinguish between right and wrong as to the consequences of his own act and conduct, he is responsible for his act. In other words, if he was not, at the time of the homicide, afflicted with insanity to such an extent as to dethrone reason and incapacitate him from distinguishing between right and wrong as to the consequences of his own act and conduct, it would be your duty to find against the plea of defendant of insanity. A lunatic or person insane, without lucid intervals, shall not be found guilty of any crime or misdemeanor of which he may be charged; provided, the act so charged as criminal was committed in the condition of such lunacy or insanity; but if a lunatic has lucid intervals of understanding, he shall answer for what he does in those intervals as if he had no deficiency. So, gentlemen of the jury, if you find from the testimony that the defendant was afflicted with insanity at times, he would be responsible for his acts when not under the influence, or not in that state of mind. If he did the act, and was not in one of these conditions at the time—not in a condition of not distinguishing between right and wrong at the time—he would be responsible for his act as though he was not afflicted with insanity at all."

The complaint of the plaintiff in error is that the judge presented the law of total insanity, and not a theory of partial insanity or temporary insanity or distortion of mind growing out of a physical condition of the defendant and its effect (by reason of the shat-

tered nervous system of defendant and the use of stimulants and opiates) on his mental condition.

Counsel for plaintiff in error insists, that, under the evidence as to the physical condition of the defendant, excitement would unbalance him and cause him to lose his normal judgment and discretion and make him like a man wild or crazy, and that under these conditions, although the defendant did not set up full insanity, nor seek to prove it as a complete defense, in and of itself, defendant was not to be held to use the same normal judgment, discretion, and coolness that the ordinary man would be called on to use, and that the judge should have instructed the jury that the defendant should be judged as he was, and not held to the standard required of the normal ordinary man unafflicted as he was, with reference to his conduct at the time of the difficulty; that the jury should have been instructed that they should consider the mental condition or distortion of mind of the defendant, if they believed such was caused by his physical condition, in determining whether the defendant acted in good faith, believing that there was a necessity for taking the life of his assailant to save his own life or to prevent a felony from being perpetrated upon him. The exact exception to the charge quoted above is thus set out by plaintiff in error in his motion for new trial: "The defendant did not set up as matter of defense such insanity at the time of the homicide as would make him irresponsible for his acts under the general rules of law relating to pleas of insanity, but offered evidence of a partial or temporary insanity, or weakness of mind or distortion of mind in connection with his weakened physical condition and his disturbed nervous system, and the habit of taking liquor and narcotics, as impairing his capacity, under circumstances of excitement or danger, to act with the same coolness and deliberation and discretion as the average or ordinary man would be held to act and judge; and the defendant by his counsel claimed, that, owing to his mental and physical condition, he would not be held, and should not be held by the court and jury to act with the same discretion and judgment as the ordinary physically and mentally sound man, and claimed that the court should submit that question in his charge to the jury; that in determining as to whether he acted in good faith, believing that his life was in danger and that it was necessary to shoot the deceased to save himself, the jury

should have been allowed to consider this question. This theory of defense was not submitted at all by the court to the jury, but in lieu thereof the court gave to the jury the general law of insanity, and the movant insists that he erred therein, and further.erred in not submitting the claim, as above set forth, which was urged by the defendant through his counsel."

The objection is twofold, that the charge on, insanity, being irrelevant, was hurtful to the defendant; and that the real contention of the defendant upon this subject was not presented. We find no error in the charge complained of, and if fuller and more explicit instructions were desired they should have been requested. It appears from the record that evidence was introduced for the purpose of showing that the defendant was insane at the time of the homicide; and therefore it was incumbent upon the. court not to turn the jury loose upon that evidence without chart or compass to aid them in applying it. And the rule announced by the court has been uniformly recognized in this State at least ever since the case of *Roberts* v. *State,* 3 *Ga.* 310. The rule there laid down by the Supreme Court is as follows: "If a man has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible." The only exception made to this general rule is where the act done is *connected with* a peculiar *delusion,* and is committed in consequence of such delusion without criminal intent but by reason of the will being overmastered and overpowered by such delusion. The doctrine laid down in the *Roberts* case has never been overruled or questioned by the Supreme Court. The case has frequently been cited with approval. See *Choice* v. *State,* 31 *Ga.* 424; *Danforth* v. *State,* 75 *Ga.* 614, 58 Am. R. 480; *Carr* v. *State,* 96 *Ga.* 294, 22 S. E. 570; *Flanagan* v. *State,* 103 *Ga.* 625, 30 S. E. 550; *Taylor* v. *State,* 105 *Ga.* 775, 31 S. E. 764.

The judge could not present the theory of partial or temporary insanity, insisted upon by the plaintiff in error, because there was no evidence that the defendant was acting under the influence of any delusion and that the act was committed in connection with such delusion. There has never been any morbid sentimentality on the subject of insanity in the decisions in this State, and yet there has been always the exercise of the largest humanity in behalf of the actually insane. The question is not without difficulty. As

said by Judge Nisbet in *Roberts* v. *State,* supra: "The laws of
the sane mind are but little understood; much less are the laws,
if indeed such phraseology is predicable of it, of the *unsound mind.*
. . We can judge of the one by external developments and by our
own consciousness; of the other only by external indicia. There
are few men so balanced in intellect as not at some times and upon
some subjects to approximate towards derangement. . . Intel-
lectual enthusiasm, not unfrequently, approaches the line of insan-
ity. The numerous cases of mania or delusion which leave the mind
sound in general, but as to certain things shattered or wholly ob-
literated, have increased the difficulty of any specific general rule as
to the responsibility of those . . generally classed as insane.
. . The subject of insanity is not responsible—humanity, rea-
son, the law so adjudges. . . In all definitions of murder, of
which I have knowledge, the requirement is found that the slayer
must be of sound mind. Our own statutory definition requires
him to be 'a person of sound memory and discretion.' Accounta-
bility for crime presupposes a criminal intent, and that requires a
power of reasoning upon the character and consequences of the
act; a will subject to control. . . The difficulty is to determine
who is 'a person of sound memory and discretion,' who is incapa-
ble of a criminal intent, who is incapable of reasoning upon the
character and consequences of the act, and who is without control
over his will. . . Mr. Chitty says, 'in criminal cases the ques-
tion is, whether, at the time act was committed, the prisoner was in-
capable of judging between right and wrong, and did not then
know that the act was an offense against the law of God and
nature.' . . There are some exceptions . . one, certainly,
which was first established in the leading case of The King v. Hads-
field. The great speech of Mr. Erskine in defense of Hadsfield
has shed new light upon the law of insanity. . . It is looked
upon by the profession as authority. . . In that case he as-
sumed the position that a man might have reason sufficient to
distinguish between the right and the wrong of the act about to
be committed, . . and yet, by reason of some delusion over-
mastering the will, there might be no criminal intent. To apply
this proposition it was admitted by Mr. Erskine that the act itself
must be connected with the peculiar delusion under which the
prisoner labours. . .. To use the language of Mr. Erskine, 'rea-

son is not driven from her seat, but distraction sits down upon it along with her, holds her trembling upon it and frightens her from her propriety.'" Our courts have never gone to the full extent of Mr. Erskine's argument, and certainly have never held the contention of the plaintiff in error upon this subject to be the law. No decision has come under our observation where temporary insanity or loss of self-control, caused by physical infirmity, has been held to justify a killing or even to reduce the offense from murder to manslaughter. In its last analysis the contention of the plaintiff in error is, that, while ordinarily sane, his physical condition was such and his nerves were so unstrung that he was more easily excited than an ordinary man, and that when thus excited he became temporarily irresponsible. Similar defenses have been several times disapproved by our Supreme Court. In *Fogarty* v. *State*, 80 *Ga.* 450, 5 S. E. 782, the Supreme Court held that there was no error in refusing to charge the jury that "if the defendant commit an assault, knowing it to be wrong, when driven to it by an uncontrollable and irresistible impulse, arising not from natural passion but from an unsound condition of mind, he is not criminally responsible." In the case of *Patterson* v. *State, 86 Ga.* 70, 12 S. E. 174, while the court affirmed the judgment of the trial judge in excluding certain testimony for a different reason, Chief Justice Bleckley took occasion (while the language used by the trial judge is not stated) to say that what he said was pertinent, and the ruling upon the question in that case is authority for the statement that the citations of the learned counsel for plaintiff in error upon the subject of the appearance and general health, etc., of the person whose sanity is in question, are not in point in this case. In *Lee* v. *State,* 116 *Ga.* 569, 42 S. E. 759, and in *Rogers* v. *State,* 128 *Ga.* 67, 57 S. E. 227, the doctrine announced in *Studstill* v. *State,* 7 *Ga.* 12, that there is no distinction as to partial or temporary insanity, and that such insanity is not recognized as a defense relieving from responsibility of crime, is reaffirmed. In *Lee's* case the trial judge refused, upon request, to charge the jury that if they believed from the evidence that the defendant, at the time of the homicide, was afflicted with epilepsy to such an extent as to be insane and that under the influence of such epilepsy he was incapable of controlling his action, but was impelled by the effect of such disease to the commission of the homicide in question, even though he may have had knowledge as to

the right or wrong of the action in question, he would not be guilty. The refusal to thus instruct the jury was expressly approved. The court then proceeded to reaffirm the former decision .as to the general rule and the exception in regard to delusional in-.sanity. But as to a very similar theory to that contended for by the plaintiff in error in this case, Chief Justice Simmons, delivering the opinion, says, "It seems to us that to uphold such a theory would be to put the public at the mercy of any person who fails to suppress his anger or jealousy; who is sane at one moment, insane at the next, and then immediately afterward sane again. . . It is, however, useless to elaborate any further, as this court is bound by its former decisions upon this subject, which will be found cited in *Carr* v. *State,* 96 *Ga.* 284, 22 S. E. 570, *Taylor* v. *State,* 105 *Ga.* 746, 31 S. E. 764; *Minder* v. *State,* 113 *Ga.* 773, 39 S. E. 284. We therefore conclude that those requests to charge, which sought to substitute another test of sanity for the knowledge of right and wrong, should not have been given. With regard to the exception to the general rule in case of delusional insanity, the charge was correct, and followed the cases of *Roberts* v. *State,* 3 *Ga.* 310; *Danforth* v. *State,* 75 *Ga.* 614; *Flanagan* v. *State,* 103 *Ga.* 619."

In this case no request was preferred, but had the defendant obtained all he contended for in this ground of the motion, it certainly could not have reduced the offense lower than voluntary manslaughter, and in view of the finding of the jury no possible harm was done him. The evidence upon the subject of insanity was introduced by the defendant in the testimony of Dr. Chapman, his sister, and other witnesses; and as insanity at the time of the commission of the alleged crime need not be specially pleaded but may be relied upon as a defense under the plea of general issue, we think the trial judge should have charged upon the subject. As there was no evidence of delusion on the part of the defendant or that he acted under the influence of such delusion in the commission of the act with which he was charged, there was no error in not extending the instructions given.

The fifth ground of the motion alleges that the court erred in rebuking one of the defendant's witnesses in the presence of the jury and thereby prejudicing defendant's case by discrediting his witness. This is specially insisted upon because plaintiff in error argues that the court was unfair, in the trial, to the defendant, and

partial to the State, as shown by the difference of treatment given these witnesses by the court. It appears that the witnesses had been separated and that the defendant's witness, not having been informed of the order of the court sequestering the witnesses, sat down for an instant in the court room before he came to the stand. Upon this fact being disclosed, although defendant's witness said he heard none of the evidence, the court said to said witness, "You knew the witnesses were separated yesterday, didn't you?" Upon the witness replying in the affirmative, the court inquired, "Why did you come in the court-house and sit down?" And when the witness answered that he sat down because he was expecting to take the witness chair, the court remarked, "We will see about this when we get through." Plaintiff in error contrasts this with the action of the court in connection with a witness sworn on the part of the State, who had been in the court-house a portion of the day during the delivery of testimony, and to whom objection was made as a witness upon that ground, but whom the court allowed to testify. We do not fully approve the practice of threatening a witness in the hearing of the jury, but we can not say that any threat was necessarily implied by the language of the court. The language of the court is just as susceptible of the idea that the court did not wish to consume time with a further examination into the matter at that time and that he would not, if a hearing was had, punish the witness, as to the construction that, by his language, he threatened witness. But even if he had fined the witness for disobedience of his order, we could not control his discretion, unless manifestly abused, nor would it necessarily follow that the credibility before the jury would be diminished because of the fact that the court might have adjudged him guilty of disobedience of the court's orders. So far as the treatment of the State's witness being improper, it is always discretionary with the trial court as to whether certain witnesses may, for any special reason, be allowed to remain in the court room, and the fact that the witness has heard the testimony is not sufficient reason to exclude his testimony. We can not say that the treatment of the two witnesses shows partiality to the State or was prejudicial to the defendant, as was contended by plaintiff in error, nor that the treatment of these two witnesses, as it appears in the record, is tanta-

mount to an expression of opinion, on the evidence in the case, unfavorable to the accused.

6. The sixth ground of the motion contends that the court erred in allowing testimony from the witness, Mrs. Gill, showing that her husband had sold liquor and trying to show that she herself had sold liquor. The objection to the evidence was that it was immaterial and irrelevant. And error is also assigned because such evidence was not proper to be used as a mode of impeachment. We readily concur in the opinion of counsel for plaintiff in error that the fact that the party may or may not have been guilty of unlawfully selling intoxicating liquor is not a proper mode of impeaching a witness, and the business followed by the witness's husband was immaterial. But conceding that the court erred in his ruling in this matter, the error is not sufficiently grave to warrant a reversal.

7. There was no error on the part of the trial court in refusing to allow the witness, Reeves, to show that the pasture in question in the lawsuit which preceded the difficulty was in the possession of Carter and that he had the right to it. In any view of the case this evidence was immaterial.

8. Nor was any harm done the defendant by the refusal of the court to allow the witness, Jackson, to testify what the defendant threw up early in the morning of the day of the difficulty. The court allowed testimony without limit as to the comparative size and strength of the defendant and the deceased at the time of the difficulty, and the witness, Jackson, was allowed to testify as to the health of the defendant early in the morning of that day and that the defendant turned sick and threw up. If defendant was sick, and the sickness had not been relieved at the time of the difficulty, the weakness caused thereby might be considered by the jury, but could not be material as to what was thrown up, in the absence of any statement to the court by counsel as to what he expected to show.

9. The defendant also insisted in his motion that a new trial should be granted upon the ground of newly-discovered evidence. The affidavit of W. M. Raper tended to show that while the deceased was being undressed after the difficulty his pants fell upon the floor and something heavy hit the floor (presumably a knife), and that deceased showed great anxiety about what was in his pocket and called several times to his wife and family to see after

it. This witness also testified that he asked the deceased what caused the trouble, and he said "Oh Lord, I couldn't take everything." This witness testified at the trial.

The most that can be said as to the testimony of this witness, in so far as being of advantage to the defendant is concerned, is, that it tends to show that the deceased might have had a knife in his pocket when he was carried home and therefore might have had one at the time of the difficulty. As this evidence is merely cumulative of the testimony of several witnesses for the defendant, who testified on the trial more strongly to the same effect, it affords absolutely no reason for granting a new trial. The other affidavit, made by Joseph Hendrix, can not be considered, because it is not accompanied by the affidavits of counsel or of the defendant or of witnesses vouching for deponent's good character and association, as required by law.

After a very painstaking investigation and consideration of the mass of testimony in this case and careful examination into every contention urged by the plaintiff in error, we are firmly convinced that no error was committed requiring the grant of a new trial. The evidence was conflicting; we have no power to disturb the verdict of the jury thereon. And if we had such power, the interest of society would not be subserved by its exercise in this case.

*Judgment affirmed.*